Filed 7/21/14   (unmodified opn. attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>KENNETH WESLEY BROWN,<br><br>　　　Defendant and Appellant. | C066262<br><br>(Super. Ct. No. 09F06523)<br><br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on June 25, 2014, be modified as follows:

1.  On page 12, the first sentence of the second paragraph should read:

This court in *James* noted what weapons are protected under *Heller*.

2.  On pages 17-18, the paragraph beginning "Second, the federal registration" should be modified to read:

Second, the federal registration requirement for short-barreled shotguns and other listed weapons is designed to eliminate criminal use of these inherently dangerous weapons.  "The registration requirement reflects Congress's determination that certain

1

weapons are almost certain to be used for unlawful purposes: 'The primary reason that unregistered possession of these particular weapons is a crime is the virtual inevitability that such possession will result in violence.' " (*United States v. Serna* (9th Cir. 2006) 435 F.3d 1046, 1048.) In rejecting a defendant's argument that because a short-barreled shotgun may be legally possessed in Wisconsin and under federal law, its mere possession does not constitute a "crime of violence" for purposes of United States Sentencing Guidelines (USSG), the Seventh Circuit said, "While it is true that federal law provides for the legal registration of sawed-off shotguns [citation], [the defendant's] reliance on [s]ection 5861 actually cuts against his argument. Under [s]ection 5861(d) 'only those firearms must be registered that Congress has found to be inherently dangerous and generally lacking usefulness, except for violent and criminal purposes, such as sawed-off shotguns and hand-grenades.' [Citation.] Thus, 'the primary reason that unregistered possession of these particular weapons is a crime is the virtual inevitability that such possession will result in violence.' [Citations.] . . . [M]ost firearms do not have to be registered -- only those that Congress found to be inherently dangerous." (*United States v. Brazeau* (7th Cir. 2001) 237 F.3d 842, 845.)[1] Thus,

---

[1] In *Brazeau*, the Seventh Circuit held that possession of a sawed-off shotgun was a "crime of violence" under the USSG definition. (18 U.S.C. Appen. § 4B1.2; *Brazeau, supra*, 237 F.3d at p. 844.) In a petition for rehearing, defendant points out that in *United States v. Miller* (7th Cir. 2013) 721 F.3d 435, the Seventh Circuit, interpreting nearly identical statutory language in the Armed Career Criminal Act (18 U.S.C. 924, subd. (e)(1) (ACCA), held that possession of a short-barreled shotgun is not a "crime of violence" under the ACCA. (*United States v. Miller, supra,* at p. 437.) Defendant misses the point. Neither the USSG nor ACCA definition of "crime of violence" is at issue here. The point in our reference to a limited portion of the discussion in *Brazeau* is that Congress has allowed the possession of certain *inherently dangerous* weapons to be legal under federal law *only if registered*. The Congressional findings on the inherent dangerousness of short-barreled shotguns discussed in *Brazeau* are not disputed in *Miller*. To the contrary, the *Miller* court acknowledged, "Congress quite rightly found that such weapons serve no legitimate purpose." (*Id*. at p. 442.) The court also acknowledged the well-recognized characteristics of short-barreled shotguns -- "enhanced ability to conceal

defendant's reliance on the ability to register shortened shotguns in some states cuts against his argument here. To be law-abiding under federal law and state law allowing the possession of weapons like defendant's, citizens in those jurisdictions must register their weapons because of their inherent dangerousness and use by criminals. Indeed, as part of the process, a person seeking to register a short-barreled shotgun must provide a certificate from a state or local law enforcement official certifying the official has no information indicating that the person will use the firearm for other than lawful purposes. (27 C.F.R. § 479.85; see fn. 7, *ante*.)

There is no change in judgment.

Defendant's petition for rehearing is denied.

      BLEASE      , Acting P. J.

      ROBIE      , J.

      MURRAY      , J.

---

and wide spread of shot" (*id*. at pp. 440, 442) -- facts the court noted spurred Congress to require registration. (*Id.* at p. 442.) And the court expressly stated it did not disagree with the observation in another case about the short-barreled shotgun's "ability to enable violence and that possession of such a weapon makes it more likely that the offender will later use it." (*Id*. at p. 443.) Accordingly, we deny defendant's petition for rehearing.

Filed 6/25/14   (unmodified version)
<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C066262 |
| Plaintiff and Respondent, | (Super. Ct. No. 09F06523) |
| v. | |
| KENNETH WESLEY BROWN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Benjamin G. Davidian, Judge.  Affirmed.

Laurie Wilmore, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts III and IV of the Discussion.

1

Defendant Kenneth Wesley Brown was convicted of possession of a "short-barreled shotgun" under former Penal Code section 12020.[1]  (Stats. 2008, ch. 699, § 18.)  Defendant had been found in possession of the weapon in his home.  California's statutory definition of "short-barreled shotgun" includes a shotgun with a barrel less than 18 inches long or with an overall length of less than 26 inches, regardless of the length of the barrel.  The barrel of defendant's shotgun was one quarter inch longer than the minimum length of 18 inches, but the overall length was 25 and a half inches -- too short by half an inch.  He appeals, contending the statute, on its face and as applied, violates the Second Amendment's right to bear arms and equal protection.  He also claims the trial court erred in denying his motion for acquittal (§ 1118.1) due to insufficiency of evidence, and made instructional errors.

We conclude that California's ban on shotguns with an overall length of less than 26 inches does not violate the Second Amendment or equal protection.  We also reject defendant's other contentions.

We affirm.

---

[1] Undesignated statutory references are to the Penal Code in effect at the time of defendant's crime.  After defendant's offense, former section 12020 (Stats. 2008, ch. 699, § 18), prohibiting possession of a wide variety of weapons, was repealed and recodified in a nonsubstantive reorganization which divided former section 12020 into new numbered sections.  (Stats. 2010, ch. 711, § 4, effective January 1, 2012; see §§ 16000 [Deadly Weapons Recodification Act of 2010], 16005 ["Nothing in the Deadly Weapons Recodification Act of 2010 is intended to substantively change the law relating to deadly weapons"].)  The ban on possession of short-barreled shotguns and rifles is now contained in section 33215, with short-barreled shotguns defined in section 17180.  For convenience, the parties to this appeal refer to former section 12020, which was used throughout the record and the cited case law.  For clarity, we also refer to former section 12020.

**FACTUAL AND PROCEDURAL BACKGROUND**

An information charged defendant with felony possession of a "sawed-off shotgun," in violation of former section 12020, subdivision (a).

Former section 12020 provided in part:

"(a) Any person in this state who does any of the following is punishable by imprisonment in a county jail not exceeding one year or in the state prison:  [¶] (1) . . . possesses . . . any short-barreled shotgun . . . .  [¶] . . . [¶]

"(c)(1)  As used in this section, a 'short-barreled shotgun'[2] means any of the following:

"(A) A firearm which is designed or redesigned to fire a fixed shotgun shell and having a barrel or barrels of less than 18 inches in length.[3]

"(B)  *A firearm which has an overall length of less than 26 inches and which is designed or redesigned to fire a fixed shotgun shell.*

"(C) Any weapon made from a shotgun (whether by alteration, modification, or otherwise) if that weapon, as modified, has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length."  (Former § 12020; now § 17180, italics added.)

---

[2]  "Shotgun" as used in the statute means "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of projectiles (ball shot) or a single projective for each pull of the trigger."  (Former § 12020, subd. (c)(21); Stats. 2008, ch. 699, § 18.)

[3]  At trial, the parties agreed the barrel length did not violate former section 12020. Rather, it was the overall length of the shotgun that was too short.  Consequently, they referred to the weapon as "an unusually short shotgun."

**Pretrial Hearing Concerning Expert Testimony about the Shotgun**

The trial court conducted an Evidence Code section 402 hearing in which a district attorney's office investigator, Marcello Codog, testified. Codog had extensive experience with firearms over the course of 23 years in law enforcement. He served 20 years on the Sacramento Police Department, including assignments as a SWAT officer, Range Instructor and Range Master. At the time he testified, he was the Range Master for the district attorney's office. In addition to standard academy and range training, he had 244 hours firearms training, including a 64-hour POST-certified firearms instructor training and 80 hours range instructor course. He also had advanced weapons training for his previous SWAT assignment at the Sacramento Police Department.

In the hearing, Codog described that the stock of the shotgun here had been cut, a hole had been filled in with putty, and then the stock had been spray-painted. Additionally, the shotgun barrel had been cut. Codog also testified that generally, the shorter the barrel of a shotgun, the wider the spread of pellets it discharges. A modern-day tactical or combat shotgun typically would have a barrel length of 20 to 26 inches and a pistol grip.

Codog testified that he has spoken with people who had been arrested for possession of illegally modified shotguns about why they carried these weapons and why the weapons had been modified. He also received training concerning the criminal purpose of modifying shotguns. He explained that people shorten shotguns to make the weapon easily concealable on a person under a shirt or jacket or in a vehicle or house, and "in a use situation on the streets, it's easily manipulated because of the size. [¶] And there is an intimidation factor to a sawed-off shotgun. It's just a psychological-type thing." The trial court asked Codog, "Would it also be more useful or effective in say, home protection, in that you are in the close confines of a hallway or something like that, that you could actually protect your home or yourself in that situation, as well?" Codog responded, "Yes, it would be."

4

The trial court concluded that Codog was sufficiently qualified as an expert in firearms to make the observations that the stock and barrel of the gun had been modified. The trial court sustained defendant's objection to Codog's testimony that people modify shotguns to make them concealable or easier to handle in confined places on the ground the defense was not provided sufficient notice of this proposed testimony.

**Trial Evidence**

California Highway Patrol (CHP) officers found the shotgun in defendant's home on August 27, 2009, pursuant to a search warrant obtained following defendant's remarks to a CHP officer and Department of Motor Vehicles (DMV) employees.

A CHP officer testified that, on March 25, 2009, around noon, he pulled over a car driven by defendant for making an illegal U-turn (Veh. Code, § 21461 [disobeying a traffic control sign]). Defendant was upset about getting a ticket because he had just got his license back from a prior matter. As defendant signed the new citation, he told the officer, "I can't wait." The officer testified he asked what defendant couldn't wait for, and "he [defendant] said I'm gonna blow shit up, quote, and then he said something under his breath kind of unintelligible, and then I heard very distinctly AR-15," which is an "assault rifle." The officer retreated to his patrol car and called for back-up. When other officers arrived, defendant initially rolled up his windows and refused to get out of his vehicle. After he got out, he clinched his fists across his chest and told the officers, "Shoot me." The officers knocked defendant to the ground and deployed a taser. Because of his behavior, his rigid muscle tone and sweating, the officers thought defendant was under the influence of drugs. Defendant refused to take a chemical test, which led to a DUI arrest and forcible draw of defendant's blood. As a result of his refusal, his license was suspended. However, no drug or DUI charges were filed.

A DMV employee testified that on June 16, 2009, she took a phone call from a person inquiring about why his license had been suspended or revoked. He gave her his license number and identified himself as Kenneth Brown. He was "very upset to begin

with, and it got even worse" once the DMV worker got his license number. She explained she could not help him because court action had already been taken. She tried to give him the phone number for the Mandatory Actions Unit to apply for a late hearing, but he got upset and rude and said he knew DMV does not have metal detectors, and he can come in at anytime with a gun and "light the place up." Defendant ended the phone call. The DMV employee was disturbed and reported the call to her manager. A CHP officer took the employee's statement a few days later.

Another DMV worker testified that on August 17, 2009, she took a phone call from a person who gave defendant's license number and identified himself as Kenneth Brown. He was upset about his license being suspended for refusal to take a breath or blood test. He said DMV does not have metal detectors. The worker told him that the last time someone said that to DMV, DMV called the police. DMV called the police, and an officer took the employee's statement.

Defendant's mother, Dorothy Brown, called as a prosecution witness, testified that defendant lives with her in her house. On August 19, 2009, a CHP officer came to her house and asked for defendant, who was not home. She later relayed to defendant the officer's request for a phone call. On August 27, 2009, CHP officers returned, banged on the door, busted it open, and entered with guns drawn. Mrs. Brown came out of the bathroom and saw officers with defendant on the floor.

Mrs. Brown testified that defendant was the only person living in the bedroom at the time the police found the shotgun there. Defendant had had a friend living there with him, but the friend moved out a year before the police search. Before that, another person had shared the room but had moved out two to three years before the police search. Mrs. Brown was unaware of any guns in the house until the police search. She did not go into defendant's bedroom because she is confined to a wheelchair, and the room was very cluttered. There are items all over the floor and furniture. Her other son and adult grandchildren also had access to the house.

6

CHP Officer Jeff Asnicar testified that on August 19, 2009, he received a report about defendant's threat to the DMV.  The officer also had reports of the June 2009 threat to the DMV, and the March 2009 traffic stop.  He went to defendant's residence and spoke with his mother, who said he was not home.  The officer left a card and asked that defendant call him.  After a week with no contact from defendant, the officer obtained a search warrant on August 26 and conducted a search for firearms and explosives on August 27, 2009.  The search revealed an unloaded Winchester model .37 shotgun (16-gauge) and fourteen 16-gauge shotgun shells in a pillowcase under the bed in defendant's bedroom.  While nothing else under the bed caught the attention of the officer who found the shotgun and ammunition, the officer acknowledged on cross-examination that this did not mean that there was nothing else under the bed and that the entire room was very cluttered.  Two additional shotgun shells were found in a storage bin basket near the bedroom door.  Because the shotgun appeared short for a shotgun, the officers measured the overall length, from the end of the stock in a straight line parallel to the barrel, to where the barrel ended; it was 25 and a half inches.

Codog testified to his experience with firearms.  He measured the shotgun.  The barrel is 18 and a quarter inches from the top of the muzzle to the end of the breach.  There is a rough bezel or slant to the edge of the barrel, unlike the smooth clean machine cut made during the manufacturing process.  This indicated the barrel has been altered or cut down with some type of saw blade and then probably filed to smooth out the burrows that would be made during the cut.  Codog researched Winchester Model 37 shotguns and learned they were manufactured between 1936 and 1963, with barrels 26 to 30 inches long, sometimes 32 inches.  He found nothing indicating that any version of this model was manufactured with a barrel less than 26 inches.  Officer Codog said the butt stock of the gun in evidence also appeared to have been cut off or altered to convert it to a pistol grip.  The butt was not smooth, as would come from a manufacturer.  Rather, it was very rough cut, and a portion around the edge of the cut was rougher and not uniform, and

7

there was a little raised portion of metal, and some type of filler material. This model shotgun was last manufactured in 1963 and pistol grip shotguns were not introduced until the late 1970s. A pistol grip shotgun is the modern day version of a "tactical close combat shotgun." The pistol grip shotgun is a shorter weapon that can be held with one hand as opposed to a full size butt stock that would be placed on the shoulder.

Defendant did not testify.

The defense called one witness -- the officer who took the report of the June 2009 DMV threat. He testified the DMV employee said the caller said that he was not getting any satisfaction over the phone, that there were no metal detectors at DMV, and that if he could not get any satisfaction, he would get it somehow. The officer testified the DMV employee did not say that the caller said, "I've got a gun and I'm going to come down there and light the place up."

### Section 1118.1 Motion

Defendant raised a constitutional challenge in the trial court in a motion for judgment of acquittal under section 1118.1 after all of the evidence was in.[4] He argued there was insufficient evidence that he knew of the gun's illegal character but, even if the evidence sufficed on that element, his possession of the shotgun measuring less than 26 inches long was protected by the Second Amendment. In the context of his Second Amendment argument, he also argued the statute violated equal protection because the subject gun was less concealable than handguns, and handguns are not banned. The trial court denied the motion.

---

[4] Section 1118.1 provides in pertinent part: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal. . . ."

8

## Verdict and Sentencing

The jury found defendant guilty on the single count of illegal possession of a "short-barrel[]ed shotgun."

The trial court suspended imposition of judgment and sentence and placed defendant on formal probation for five years, with confinement in jail for 180 days, reduced to 90 days if defendant successfully completed an anger management course.

## DISCUSSION

## I. Second Amendment

Defendant contends the statutory ban on a shotgun with a barrel length of 18 inches and a total length of less than 26 inches (former § 12020), without an exception for in-home self-defense, is unconstitutional (1) on its face and (2) as applied to defendant, in violation of the Second Amendment right to bear arms. We disagree.[5]

## A. Facial Challenge

The Second Amendment to the United States Constitution provides: "A well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed."

The Second Amendment protects an individual's right to possess handguns in the home for self-defense. (*District of Columbia v. Heller* (2008) 554 U.S. 570 [171 L.Ed.2d 637] (*Heller*).) The Fourteenth Amendment's due process clause makes the Second

---

[5] In reorganizing the deadly weapon statutes in 2010, the Legislature stated in section 16025: "(a) A judicial decision determining the constitutionality of a previously existing provision is relevant in determining the constitutionality of any provision of [the 2010 reorganization]. [¶] (b) However, in enacting the Deadly Weapons Recodification Act of 2010, the Legislature has not evaluated the constitutionality of any provision affected by the act, or the correctness of any judicial decision determining the constitutionality of any provision affected by the act. [¶] (c) The Deadly Weapons Recodification Act of 2010 is not intended to, and does not, reflect any determination of the constitutionality of any provision affected by the act."

9

Amendment fully applicable to the states. (*McDonald v. City of Chicago* (2010) 561 U.S. 742 [177 L.Ed.2d 894] (*McDonald*).)

The District of Columbia law at issue in *Heller* totally banned handgun possession in the home and required that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable. (*Heller, supra*, 554 U.S. at p. 628.) The court in *Heller* held that the Second Amendment's protection extends beyond militia activities; it extends to individual self-defense, which is the "central component" of the right "codified" in the Second Amendment. (*Id.* at p. 599.) The court explained, "the inherent right of self-defense has been central to the Second Amendment right. The handgun ban amounts to a prohibition of an *entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose*. The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute." (*Id.* at p. 628, italics added.) Therefore, citizens must be permitted to possess handguns for the core lawful purpose of self-defense. (*Id.* at p. 630.) The *Heller* court concluded the total ban on handguns in the home, without an exception for self-defense, violated the Second Amendment. (*Ibid.*)

However, the *Heller* court also said the Second Amendment right is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." (*Id.* at p. 626.) The court noted that some long-standing prohibitions are "presumptively lawful regulatory measures" -- laws prohibiting the possession of firearms by felons and the mentally ill, forbidding the carrying of firearms in sensitive places such as government buildings, regulating the carrying of concealed weapons, or imposing conditions on the commercial sale of arms. (*Id.* at pp. 626-627 and fn. 26.) The court offered this list of "presumptively lawful regulatory measures" merely as examples and expressly stated it is not an exhaustive list. (*Id.* at p. 627, fn. 26; *People v. Ellison* (2011) 196 Cal.App.4th 1342, 1348 (*Ellison*).)

10

The *Heller* court also indicated the Second Amendment's protection does not extend to all types of guns but instead to firearms "typically possessed by law-abiding citizens for lawful" non-military purposes such as self-defense. (*Heller, supra,* 554 U.S. at pp. 625-626.) The *Heller* court discussed *United States v. Miller* (1939) 307 U.S. 174 [83 L.Ed. 1206] (*Miller*), which rejected a Second Amendment challenge to federal statutory restrictions on transporting unregistered short-barreled shotguns.[6] (*Heller,* at pp. 621-625.) The court endorsed what it construed as *Miller*'s holding -- that the Second Amendment does not protect weapons, such as short-barreled shotguns, that are "not typically possessed by law-abiding citizens for lawful purposes." (*Heller,* at p. 625.)

The *Heller* court declined to establish what level of scrutiny applies to Second Amendment claims, and it left many issues unresolved regarding application of the right. (*Heller, supra*, 554 U.S. at pp. 634-635; Rostron, *Justice Breyer's Triumph in the Third Battle over the Second Amendment* (2012) 80 Geo. Wash. L.Rev. 703 [examines the various approaches taken by lower courts post-*Heller*].) The *Heller* court said, "since this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field . . . . And there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." (*Heller,* at p. 635.)

California courts have grappled with what level of scrutiny to apply in Second Amendment challenges. (See, e.g., *Ellison, supra,* 196 Cal.App.4th at p. 1347 [applied

---

[6] At the time *Miller* was decided, the National Firearms Act defined regulated firearms to include a shotgun with a barrel less than 18 inches. (*Miller, supra*, 307 U.S. at p. 175, fn. 1, quoting former 26 U.S.C. § 1132(a).) Long before *Heller* was decided, the National Firearms Act was amended to include shotguns with an overall length of less than 26 inches within the list of regulated firearms. (26 U.S.C. § 5845(a).) And the federal Gun Control Act of 1968 defined "short-barreled shotgun" to mean a shotgun with a barrel less than 18 inches long or a shotgun modified to an overall length of less than 26 inches. (18 U.S.C. § 921(a)(6).)

11

intermediate scrutiny to Second Amendment challenge to a statute prohibiting the carrying of concealable firearms in a vehicle]; *People v. Delacy* (2011) 192 Cal.App.4th 1481, 1488-1493 [concluding that means-end scrutiny does not apply to the prohibition of possession of firearms by certain misdemeanants because the prohibition is a presumptively lawful regulatory measure].)

After issuance of the *Heller* opinion, this court applied presumptive validity to a Second Amendment challenge to California's ban of specified assault weapons and .50 caliber BMG rifles. (*People v. James* (2009) 174 Cal.App.4th 662 (*James*).) This court held that California's prohibition against the possession of these weapons does not violate the Second Amendment. (*James,* at pp. 664, 676.) In doing so, this court relied on *Heller's* endorsement of *Miller's* conclusion that a prohibition of short-barreled shotguns does not violate the Second Amendment. Thus, this court stated that short-barreled shotguns are not eligible for Second Amendment protection (*James*, at p. 674), and concluded assault weapons and .50 BMG rifles are at least as dangerous. (*Id*. at p. 677.)

This court in *James* court noted what weapons are protected under *Heller*. This court said that the Second Amendment right "is the right to possess and carry weapons *typically possessed* by law-abiding citizens for lawful purposes such as self-defense. [Citation.] It protects the right to possess a handgun in one's home because handguns are *a 'class of "arms" that is overwhelmingly chosen by American society' for the lawful purpose of self-defense.*" (*James*, *supra*, 174 Cal.App.4th at p. 676, italics added.)

In *People v. Zondorak* (2013) 220 Cal.App.4th 829 (*Zondorak*), Division One of the Fourth Appellate District also addressed a Second Amendment claim grounded on *Heller* regarding California's assault weapon ban. The *Zondorak* court first addressed whether means-end scrutiny is required. Following the framework in *U.S. v. Marzzarella* (3d Cir. 2010) 614 F.3d 85, 89, the *Zondorak* court held that the Second Amendment analysis requires a two-pronged approach. Courts must first ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's

12

guarantee. If it does not, then that is the end of the analysis. If it does, then some form of means-end scrutiny is required. (*Zondorak*, at pp. 835-836.) Following this court's lead in *James*, the *Zondorak* court agreed that the prohibition against the possession of specified assault weapons does not violate the Second Amendment. (*Zondorak* , at pp. 836-839.) In doing so, the *Zondorak* court wrote, "Although *Heller* adverted to self-defense as a core interest promoted by the Second Amendment [citation], other courts have acknowledged that 'it cannot be the case that possession of a firearm in the home for self-defense is a protected form of possession under all circumstances. By this rationale, any type of firearm possessed in the home would be protected merely because it *could be* used for self-defense. Possession of machine guns or *short-barreled shotguns* -- or any other dangerous and unusual weapon -- so long as they were kept in the home, would then fall within the Second Amendment. But the Supreme Court has made clear the Second Amendment does not protect those types of weapons.' [Citation.] We agree that, when a weapon falls outside the class of weapons entitled to Second Amendment protections, neither the place in which it is stored nor the purposes for which it might be used imbues the weapon with Second Amendment protections." (*Zondorak,* at p. 837, italics added.)

For similar reasons, we now conclude that California's ban on the possession of shotguns less than 26 inches long does not violate the Second Amendment. When California first banned shortened shotguns (then termed "sawed-off" shotguns) in 1961, the purpose of the ban was to outlaw a weapon ordinarily used for criminal purposes due to its concealability, ease of handling, ability to induce terror and consequent preference by criminals. Our high court stated, "the purpose of the Legislature in enacting [former] section 12020 was to outlaw the possession of 'weapons common to the criminal's arsenal. . . .' [Citation.] This purpose proceeds from the recognition that persons who possess the specialized instruments of violence listed in the section are ordinarily persons who intend to use them in violent and dangerous enterprises." (*People v. Satchell* (1971)

13

6 Cal.3d 28, 41-42, italics omitted, overruled on other grounds in *People v. Flood* (1998) 18 Cal.4th 470, 484.) Other California courts have made similar observations about the purpose of the ban. In *People v. Favalora* (1974) 42 Cal.App.3d 988, 992, the court observed, "Certainly a sawed-off shotgun is an '*indicia* of criminal purpose' as it has no other use and causes great terror to the citizen who is confronted by it in the hands of a robber, burglar or other lawbreaker . . . ." In *People v. Stinson* (1970) 8 Cal.App.3d 497, 500, the court stated, "'Sawed-off' shotguns and rifles are suitable for unlawful purposes because of their concealability and ease of handling." In *People v. Wasley* (1966) 245 Cal.App.2d 383, 386, the court said, "The purpose [of former section 12020] is to outlaw a class of instruments . . . normally used only for criminal purposes." Handguns are different, because it cannot be said that handguns are normally used only for criminal purposes. Quite the contrary, they are typically possessed by law-abiding citizens for lawful purposes.

The uncontroverted evidence presented in the trial court through the prosecution's expert witness is consistent with the purpose of the law. As we have noted, he testified, people shorten shotguns to make the weapon easily concealable on a person under clothing, in a vehicle or in a house and "in a use situation on the streets, it's easily manipulated because of the size. [¶] And there is an intimidation factor to a sawed-off shotgun. It's just a psychological-type thing." Additionally, the prosecution's expert testified, the shorter the barrel, the wider the spread of shotgun pellets discharged by the weapon. Unlike a handgun that can fire more than one round, but can only discharge one round at a time from its muzzle, a shortened shotgun fires multiple pellets in a single discharge and a wider spread means that a shooter need not necessarily aim directly at the intended target to hit that target and a shooter could hit multiple targets with one shot. Thus, shotguns falling within the statutory definition, are more dangerous than the kinds of guns typically possessed by law-abiding citizens for lawful purposes, because these

14

guns combine lethality at the short distances characteristic of the typical criminal attack with a concealability, ease of handling close to that of a handgun and intimidation.

Defendant asserts that *Heller's* and *Miller's* reference to short-barreled shotguns related only to the barrel length, not overall length.  He points out that when *Miller* was decided, federal law prohibited firearms only by the barrel length, not overall length. (*Miller*, *supra*, 307 U.S. at p. 175, fn. 1.)  This is true, but by the time *Heller* was decided, federal law had long included shotguns with an overall length of less than 26 inches in the list of regulated firearms, and similar to California, the federal Gun Control Act of 1968 included shotguns modified to an overall length of less than 26 inches in the definition of "short-barreled shotguns."  (See fn. 6, *ante*.)  The *Heller* court mentioned no distinction, substantive or otherwise, between shotguns having a short barrel and those with an overall length of less than 26 inches then regulated under the later version of the federal law *Miller* addressed; nor do we see any such distinction.

Defendant notes that federal law allows people to possess shotguns that are less than 26 inches so long as they are registered and their possession does not conflict with the applicant's state laws.  (26 U.S.C. §§ 5861(d), 5845(a), 5822, 5812(a); 27 C.F.R. § 479.85.[7])  He also points out that some states allow the possession of shotguns less than

---

[7] Title 26 United States Code section 5861(d) provides:  "It shall be unlawful for any person--  [¶] . . . [¶] (d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record."  For purposes of section 5861, section 5845(a) defines "firearm" to include, "a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length." Section 5822 provides that a *maker's* application to make and register a firearm "shall be denied if the making *or possession* of the firearm would place the person making the firearm in violation of law."  (Italics added.)  Under section 5812(a), applications to transfer and register firearms to transferees "shall be denied if the transfer, receipt, or possession of the firearm would place the transferee in violation of law."  A federal regulation requires that the transferee provide a certificate from a state or local law enforcement official certifying the official "has no information indicating that the receipt or possession of the firearm would place the transferee in violation of State or

26 inches in length if they comply with federal law.[8]  From these observations, defendant argues that shotguns that are less than 26 inches long, but have a barrel of at least 18 inches are possessed by law abiding citizens.  Defendant's argument is flawed.

First, even with the possibility of registering such firearms under federal or state law in other states, no evidence has been presented here indicating that short-barreled shotguns and shotguns shorter than 26 inches share the same popularity as handguns such that shortened shotguns are "*typically* possessed by law-abiding citizens for lawful

---

local law or that the transferee will use the firearm for other than lawful purposes."  (27 C.F.R. § 479.85.)

[8] Defendant points out that Alaska, Arizona, Florida, Maryland, and Wisconsin permit the possession of shotguns lawfully possessed under federal law.  (Alaska Stat. § 11.61.200, subd. (c) ["It is an affirmative defense" to a prosecution for possession that the possession "of the prohibited weapon was in accordance with registration under 26 U.S.C. 5801-5872 (National Firearms Act)"]; A.R.S. § 13-3101, subd. (B) [prohibited weapons "do not include any firearms or devices that are registered in the national firearms registry and transfer records of the United States treasury department "]; Fla. Stat. § 790.221, subd. (3) [short-barreled shotgun "lawfully owned and possessed under provisions of federal law are excepted" from prohibition on possession]; Md. Pub. Saf. Code Ann. § 5-203, subd. (a)(2) [a person may not possess a short-barreled shotgun unless it "has been registered with the federal government in accordance with federal law"]; Wis. Stat. § 941.28, subd. (4) [prohibition or possession of short-barreled shotgun does not apply to possession by "any person who has complied with the licensing and registration requirements under 26 USC 5801 to 5872" or to any firearm "that may be lawfully possessed under federal law, or any firearm that could have been lawfully registered at the time of the enactment of the national firearms act of 1968"].)  Louisiana permits possession of shotguns less than 26 inches so long as they are registered pursuant to federal law.  (La. Rev. Stat. §§ 40:1781, subd. (3) [defining "firearm"], 40:1785 ["No person shall receive, possess, carry, conceal, buy, sell, or transport any firearm which has not been registered or transferred in accordance with Title 18 or Title 26 of the United States Code as applicable"].)  A previous Louisiana statute also called for registration with the state department of public safety, but that provision was repealed in 2013. (Former La. Rev. Stat. § 40:1783, repealed by Act 2013, No. 398, § 2.)

purposes," whether that purpose be self-defense or hunting or any other lawful activity. (See *Heller*, *supra*, 554 U.S. at p. 625, italics added.)

Second, the federal registration requirement for short-barreled shotguns and other listed weapons is designed to eliminate criminal use of these inherently dangerous weapons. "The registration requirement reflects Congress's determination that certain weapons are almost certain to be used for unlawful purposes: 'The primary reason that unregistered possession of these particular weapons is a crime is the virtual inevitability that such possession will result in violence.' " (*United States v. Serna* (9th Cir. 2006) 435 F.3d 1046, 1048.) In rejecting a defendant's argument that because a short-barreled shotgun may be legally possessed in Wisconsin and under federal law, its mere possession does not constitute a crime of violence[9] for purposes of federal sentencing guidelines, the Seventh Circuit said, "While it is true that federal law provides for the legal registration of sawed-off shotguns [citation], [the defendant's] reliance on [s]ection 5861 actually cuts against his argument. Under [s]ection 5861(d) 'only those firearms must be registered that Congress has found to be inherently dangerous and generally lacking usefulness, except for violent and criminal purposes, such as sawed-off shotguns and hand-grenades.' [Citation.] Thus, 'the primary reason that unregistered possession of these particular weapons is a crime is the virtual inevitability that such possession will result in violence.' [Citations.] . . . [M]ost firearms do not have to be registered -- only those that Congress found to be inherently dangerous. . . . Accordingly, contrary to [the defendant's] position, the fact that sawed-off shotguns must be registered confirms our conclusion that such weapons are inherently dangerous, and the possession of such a

---

[9] For purposes of the federal sentencing Guidelines, a crime of violence includes a crime that "involves conduct that presents a serious potential risk of physical injury to another." (18 U.S.C. Appen. § 4B1.2; *United States v. Brazeau* (2001) 237 F.3d 842, 844 (*Brazeau*).).)

weapon constitutes a crime of violence." (*Brazeau*, *supra*, 237 F.3d at p. 845.) Similarly, defendant's reliance on the ability to register of shortened shotguns cuts against his argument here. To be law-abiding under federal law and state law allowing the possession of weapons like defendant's, citizens in those jurisdictions must register their weapons because of their inherent dangerousness and use by criminals. Indeed, as part of the process, a person seeking to register a short-barreled shotgun must provide a certificate from a state or local law enforcement official certifying the official has no information indicating that the person will use the firearm for other than lawful purposes. (27 C.F.R. § 479.85; see fn. 7, *ante*.)

Defendant asserts that because the shotgun's barrel length was legal, "there [is] no concern that the spray pattern would be wide or dangerous as occurs in shortened barrels."[10] But there is no evidence in the record establishing that defendant's shotgun, with a barrel length of 18 and one quarter inches, would not produce a wide spray pattern. To the contrary, the prosecution's expert testified, the shorter the barrel, the wider the spray pattern. From this, we understand that the spray pattern for this shotgun would be wider than it would have been had the barrel not been modified.

According to defendant, shotguns that satisfy the legal minimum of 18 inches for *barrel* length but violate the overall length requirement of the statute, are not necessarily "unusually dangerous" and may even be safer because they may be easier for people to control than longer shotguns. He cites Investigator Codog's acknowledgement at the pretrial hearing that a short-barreled shotgun could be more effective than a longer shotgun for in-home protection, because it would be easier to maneuver in a hallway.

---

[10] In his reply brief, defendant asserts, "Shotguns with proper barrel lengths, such as [defendant's] firearm, produce no dangerous spray pattern as do those with too-short barrels. He cites two places in the record (one of which was a statement by the trial court and not evidence), neither of which support the notion that defendant's weapon would not produce a dangerous spray pattern.

Codog did not testify that such weapons may be safer. Furthermore, defendant's argument ignores the Congressional determination underlying the federal registration requirement -- such weapons are "inherently dangerous." (*Brazeau*, *supra*, 23 F.3d at p. 845; see also *United States v. Delaney* (9th Cir. 2005) 427 F.3d 1224, [Prior conviction of former section 12020, subdivision (a) is a crime of violence for purposes of federal sentencing guidelines, because "sawed-off" shotguns are inherently dangerous, lack usefulness except for violent and criminal purposes and their possession involves the substantial risk of improper physical force].)

Moreover, the fact that some shotguns with an overall length less than 26 inches might be easier to handle in a home protection situation than an unmodified shotgun does not render them constitutionally protected. A weapon is not protected merely because it *could be* used for self-defense. (*Zondorak*, *supra*, 220 Cal.App.4th at p. 837.) Furthermore, it is the shortened shotgun's concealability, together with its ease of handling in criminal settings, intimidating appearance and its ability to spray projectiles over a wider area, which makes it useful to criminals and unusually dangerous to others. The combination of these four characteristics distinguish short-barreled shotguns and those that are less than 26 inches in overall length from handguns, and it is these characteristics that make such weapons attractive additions to the arsenals of criminals. Handguns, on the other hand, are different because such weapons are not normally used only for criminal purposes, but rather, they are typically possessed by law-abiding citizens for lawful purposes.

Defendant argues the "total ban" on shotguns less than 26 inches places an undue burden on the right to in-home self-defense and cannot survive the heightened level of scrutiny that such restrictions demand. However, as we have noted, we need not engage in any means-end scrutiny, because the Second Amendment does not protect shotguns less than 26 inches long. Moreover, the prohibition here, unlike the handgun ban in *Heller*, is not a total ban of an entire *class* of weapons. Law abiding citizens can still

19

possess shortened shotguns in their homes, so long as the barrel is not less than 18 inches and the overall length is not less than 26 inches. Former section 12020 on its face did not violate the Second Amendment.

## B. "As Applied" Challenge

Defendant argues the statute "as applied to him" was unconstitutional, because the shotgun was located inside his home and was possessed in a manner suitable for self-defense. However, even assuming for the sake of argument that defendant possessed the gun for self-defense, it does not matter.[11] His possession of this gun is not protected by the Second Amendment, as we have already explained.

Defendant also complains that the gun was only half an inch too short, and the barrel length did not violate the 18-inch maximum allowed by the statute. Again, it does not matter. The gun violates the statute and is not protected by the Second Amendment.

We conclude former section 12020, as applied to defendant, did not violate his constitutional rights under the Second Amendment.

## II. Equal Protection

Defendant argues the statute violated his right to equal protection, because citizens may possess handguns at home and such weapons are more easily concealable in public

---

[11] We also note that defendant's claim on appeal that the weapon was possessed for home defense is dubious. Defendant did not testify and no witness testified about the reason defendant had the weapon. Defendant did not ask any questions of the expert or any other witness at trial about the suitability of the weapon for home defense. Nor is there any evidence short-barreled shotguns, shotguns of less than 26 inches, or shotguns of any length, legal or otherwise, is preferred for home self-defense. Moreover, the events leading up to the search of defendant's house suggests that defendant possessed the weapon for purposes other than home defense. Unlike the dagger strapped to the bedpost in *People v. Edwards* (2007) (N.Y. App. 2007) 39 A.D.3d 1078 [834 N.Y.S.2d 575] (*Edwards*), upon which defendant relies, the weapon here was not readily accessible in the event of an intruder; it was inside a pillowcase underneath his bed on a floor cluttered with other items. And it was not loaded.

20

than defendant's shotgun. For this reason, in defendant's view, the owners of shotguns shortened beyond the statutory minimum length should not be treated differently from handgun owners. We reject the argument.

The equal protection clause of the Fourteenth Amendment prohibits the government from treating similarly situated persons differently absent adequate justification, the degree of which depends on the nature of the classification. (*Grutter v. Bollinger* (2003) 539 U.S. 306, 326-327 [156 L.Ed.2d 304].) There are three levels of scrutiny. Most legislation is subject to a rational relationship level of scrutiny, i.e., whether the challenged classification bears a rational relationship to a legitimate state purpose. (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1200.) Distinctions in statutes that involve suspect classifications or touch upon fundamental interests are subject to strict scrutiny, and can be sustained only if they are necessary to achieve a compelling state interest. (*Ibid.*) An intermediate level of scrutiny exists, which generally has been applied to classifications based on gender or illegitimacy. (*Ibid.*) The burden of demonstrating the invalidity of the classification under the rational basis test rests squarely upon the party who assails it. (*Kasler v. Lockyer* (2000) 23 Cal.4th 472, 480 (*Kasler*).) "In the ordinary case, a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." (*Romer v. Evans* (1996) 517 U.S. 620, 632.)

Defendant argues strict scrutiny applies because the right to bear arms is a fundamental constitutional right, and the statute targets an entire class of firearms. However, we have explained there is no Second Amendment right to have shotguns that are less than 26 inches in length. Consequently, there is no fundamental constitutional right in play here. Strict scrutiny does not apply.

In *Kasler*, our high court applied the rational basis test and rejected an equal protection challenge to the ban on specified weapons in the Assault Weapons Control Act

21

(former § 12275 et seq.). (*Kasler*, *supra*, 23 Cal.4th at pp. 481-482.) The plaintiff argued the Act violated equal protection because it failed to include certain weapons identical to, or indistinguishable from, the listed assault weapons, and therefore treated persons who owned the listed weapons differently from persons who owned indistinguishable unlisted weapons. (*Id*. at p. 479.) The *Kasler* court said, " ' "[i]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge *if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.* [Citations.] Where there are 'plausible reasons' for [the classification] 'our inquiry is at an end.' " [Citations.] Past decisions also establish that, under the rational relationship test, the state may recognize that different categories or classes of persons within a larger classification may pose varying degrees of risk of harm, and properly may limit a regulation to those classes of persons as to whom the need for regulation is thought to be more crucial or imperative. [Citations.]' " (*Kasler, supra*, 23 Cal.4th at pp. 481-482; see also, *People v. Delacy, supra*, 192 Cal.App.4th at pp. 1494-1495 [applied rational basis test to equal protection challenge to statute prohibiting firearm possession by persons convicted of certain misdemeanors] ; *Nordyke v. King* (9th Cir. 2012) 681 F.3d 1041, 1043, fn. 2 [en banc opinion affirmed three-judge-panel's opinion that rational basis test applied to reject a claim that equal protection was violated by a county ordinance prohibiting firearms on county property which prohibited gun shows while allowing an exception for "events" such as military reenactments].)[12]

---

[12] The 2012 *Nordyke v. King* opinion was an en banc opinion filed while this appeal was pending. The parties in this appeal initially cited the three-judge panel's opinion, *Nordyke v. King* (9th Cir. 2011) 644 F.3d 776, 794, which also held the rational basis test applied to the equal protection challenge. The en banc opinion affirmed the district court's dismissal of the Second Amendment claim. (*Nordyke v. King, supra*, 681 F.3d at

22

Accordingly, we apply the rational basis test.

Defendant argues former section 12020 created two sets of similarly situated groups -- owners of shotguns shorter than 26 inches, and handgun owners. Defendant argues these two classes are similarly situated because both types of guns are concealable and capable of firing more than one round.

However, as we explained *ante* in connection with defendant's Second Amendment argument, the Legislature's purpose in banning short-barreled or shortened shotguns under former section 12020 was to outlaw weapons ordinarily used for criminal purposes due to concealability, ease of handling and ability to induce terror.[13] Furthermore, while handguns are capable of firing more than one round and some prohibited shotguns may be capable of firing more than one round, the wide spray of pellets discharged by a shotgun with a shortened barrel make it easier for criminals to hit their target and may allow them to hit more than one target with a single pull of the trigger.

---

p. 1043.) Defendant erroneously asserts in his reply brief that the *Nordyke* en banc opinion affirmed only the previous First Amendment analysis. The en banc opinion noted the county changed its position midstream and now said the ordinance allowed gun shows as events as long as the guns were in possession of authorized participants or secured to prevent unauthorized use. (*Id*. at p. 1044.) This new interpretation defeated the Second Amendment. (*Ibid*.) However, the 9th Circuit en banc said in a footnote, "The equal protection claim fails because Alameda County could reasonably conclude that gun shows are more dangerous than military reenactments. This is enough to satisfy rational basis scrutiny." (*Id*. at p. 1043, fn. 2.)

[13] In his reply brief, defendant states that he "disagrees that the shotgun's shortness in overall length makes it more dangerous because it is concealable, that prohibiting it 'prevents crime and injuries' or that it induces widespread terror." He suggests for the first time that we remand for further factual development on these points. There is no need for remand. Codog, the prosecution's expert witness, testified to these points and that testimony is uncontroverted. And as we have noted, his testimony is consistent with the legislative purpose of statute discussed in the decisional law.

We conclude there is a rational basis for prohibiting the possession of shotguns that are less than 26 inches in length. Accordingly, defendant's equal protection challenge fails.

### III. Section 1118.1 Motion

Defendant argues the trial court should have granted his section 1118.1 motion (See fn. 4, *ante*), because there was insufficient evidence that the shotgun was not possessed for in-home self-defense. We disagree, because the prosecution was not required to present such evidence.

In ruling on a motion for a judgment of acquittal under section 1118.1, the trial court applies the same standard as an appellate court reviewing sufficiency of the evidence to support a judgment -- whether there is substantial evidence of the existence of each element of the charged offense, drawing all reasonable inferences therefrom, and testing the sufficiency of the evidence at the point the motion is made. (*People v. Stevens* (2007) 41 Cal.4th 182, 200.) We review the trial court's ruling de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1213.)

The elements of the charged offense, former section 12020, required the prosecution to establish that defendant possessed the firearm; that it had the necessary characteristic to fall within the statutory description; and that defendant knew of that characteristic. (*People v. King* (2006) 38 Cal.4th 617, 627-628 (*King*).) The statute is a general intent crime, and the defendant's intended use of the gun is not an element of the crime. (*People v. Rubalcava* (2000) 23 Cal.4th 322, 328.)

Defendant argues that the United States Supreme Court opinions in *Heller* and *McDonald* have had the effect of creating a new element in the state statute -- that the prosecution must prove the defendant's possession of the gun was not for the purpose of in-home self-defense. We disagree. *Heller* and *McDonald* spoke of the tradition of *handguns* being kept in the home for self-defense. Nothing in either opinion suggests that short shotguns as defined in section 12020 were traditionally kept for self-defense.

24

To the contrary, as we have noted, the *Heller* court reaffirmed the holding in *Miller* that the Second Amendment does not protect weapons, such as short-barreled shotguns, that are not typically possessed by law-abiding citizens for lawful purposes. Thus, it does not matter whether an individual defendant intended to use a short shotgun for self-defense only.

Defendant cites two out-of-state cases, neither of which help his cause. *Herrington v. United States* (D.C. App. 2010) 6 A.3d 1237, involved a District of Columbia law which stated that no person could possess ammunition unless he was a licensed dealer, a government officer/agent/employee who possessed ammunition for his duties, or holder of a valid registration certificate or ammunition collector's certificate. (*Id*. 6 A.3d at p. 1240.) Before *Heller*, the prosecution could convict someone merely by proving he possessed handgun ammunition in his home. (*Id*. 6 A.3d at p. 1241.) *Herrington* held that, given *Heller*'s holding that the District of Columbia's ban on handguns violated the Second Amendment, the District of Columbia's ban on possession of handgun *ammunition*, as applied to a defendant who had ammunition in his home, also violated the Second Amendment, where the prosecution merely showed at trial that the defendant possessed the ammunition in his home. (*Id*. 6 A.3d at p. 1243.) The government could lawfully condition possession of handgun ammunition in the home on possession of a valid registration certificate, but the prosecution would have the burden of proving that the defendant lacked the necessary registration. (*Id*. 6 A.3d at p. 1245.) Thus, *Herrington* turned on who had the burden of proof on a statutory exception to unlawful possession. Here, no such statutory exception exists.

Defendant also cites *Edwards*, a decision of the intermediate appellate court in New York, which held there was insufficient evidence to convict the defendant of unlawful possession of dagger, where the dagger was attached by Velcro to his bedpost, suggesting it was possessed for self-defense. (*Edwards*, *supra*, 39 A.D.3d at p. 1080.) However, the statute at issue in that case made it illegal to possess "any dagger . . . with

*intent to use the same unlawfully against another*." (*Id*. at p. 1079, italics added.) The statute also provided that possession of a dagger was presumptive evidence of intent to use it unlawfully. (*Ibid*.) By establishing possession, the prosecution was entitled to the statutory presumption, but the presumption in that case was outweighed by the competing inference -- drawn from the manner in which the dagger was attached to bed in plain view to permit easy access to one lying in the bed -- that the dagger was kept for self-defense as a means of protection against intruders. (*Id*. at p. 1080.) Thus, *Edwards* involved a statute that expressly contained a specific intent element. It is therefore inapplicable here, where former section 12020 contained no specific intent element.

Defendant fails to show any basis for adding an element requiring the prosecution to prove that defendant intended to use the gun for something other than self-defense. Consequently, we conclude substantial evidence supports the conviction, and the trial court did not err in denying defendant's section 1118.1 motion.

### IV. Jury Instructions

### A. Self-defense Instruction

Defendant argues the trial court erred by failing to instruct the jury sua sponte that the prosecution had to prove the gun was not possessed for self-defense. This argument falls with our rejection of defendant's argument*, ante*, that the prosecution had to prove the gun was not possessed for self-defense.

### B. Pinpoint Instruction

Defendant argues the trial court erred in denying his request for a pinpoint instruction that it was the prosecution's burden to prove that defendant knew the shotgun was less than 26 inches. Under the same heading, defendant argues the knowledge element also required the court to instruct sua sponte on specific intent. We address specific intent, *post*. We reject both arguments.

The defense proposed the following instruction: "The prosecution bears the burden of proving that [defendant] had actual knowledge of the illegal characteristic of

26

the shotgun; that is, the prosecution must prove, beyond a reasonable doubt, that [defendant] knew that the shotgun's overall length was less than 26 [inches]."[14]

The defense derived this proposed instruction from a selective reading of *King, supra*, 38 Cal.4th 617. The trial court recognized that the defense was distorting *King* and, after extensive discussions between court and counsel, the trial court instructed the jury as follows:

"The defendant is charged with unlawfully possessing a weapon, specifically a shotgun which has an overall length of less than 26 inches as measured in a straight line and which is designed to fire a fixed shotgun shell. [¶] To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant possessed a shotgun which has an overall length of less than 26 inches as measured in a straight line and which is designed to fire a fixed shotgun shell;

"2. The defendant knew that he possessed the shotgun which has an overall length of less than 26 inches as measured in a straight line and which is designed to fire a fixed shotgun shell;

"AND

"3. The defendant knew that the object was an 'unusually short shotgun.'

"The People do not have to prove that the defendant intended to use the object as a weapon.

"A shotgun which has an overall length of less than 26 inches as measured in a straight line and which is designed to fire a fixed shotgun shell is an unusually short shotgun."

This instruction was consistent with *King*, in which the defendant was convicted of illegal possession of a short-barreled rifle in violation of former section 12020. The

---

[14] On appeal, defendant notes he also proposed a different pinpoint instruction in chambers, but it is not at issue in this appeal.

rifle had been altered to reduce its overall length to less than 26 inches. (*King, supra,* 38 Cal.4th at p. 620.) The Court of Appeal reversed the conviction, concluding the trial court erred in not instructing the jury that the prosecution had to prove the defendant knew or reasonably should have known the illegal characteristic of the short-barreled rifle. (*Id.* at p. 621.) The Supreme Court reversed the Court of Appeal and ordered the conviction reinstated. The Supreme Court held that the prosecution must prove the possessor's knowledge of the weapon's illegal characteristics. (*Id.* at pp. 622-626.) However, because the undisputed evidence showed that the defendant knew of the rifle's shortness, the trial court's failure to instruct the jury that the defendant's knowledge of the illegal characteristic was as element of the crime, was harmless error. (*Id.* at p. 628.) The defendant was aware of the rifle's shortness because he admitted he had seen it in the drawer of a workbench in his garage and probably picked it up to look at it. (*Ibid.*) Once the defendant saw the rifle, the stock of which had been crudely sawed off, he was necessarily aware of the weapon's shortness, which was the characteristic that made its possession illegal. (*Ibid.*)

The court in *King* said that requiring proof of the defendant's actual knowledge would not impose an unduly heavy burden on the prosecution, because proving a defendant's knowledge of a short-barreled rifle's illegal characteristic generally will not be too difficult a task. (*King, supra,* 38 Cal.4th at p. 627.) "First, the prosecution must prove that the item had the necessary characteristic to fall within the statutory description. It must also prove that the defendant knew of the characteristic. That is, it must prove that a defendant charged with possession of a short-barreled rifle knew the rifle was unusually short, *but the defendant need not know the rifle's actual dimensions*. Similarly, a defendant charged with illegally possessing a cane sword must know that the cane contained a sword, and a defendant charged with possessing a writing pen knife must know that the pen contained a stabbing instrument. Knowledge can, of course, be proved circumstantially. Further, the prosecution need not prove that the defendant knew there

28

was a law against possessing the item, nor that the defendant intended to break or violate the law." (*Id.* at p. 627, italics added.)

However, the court in *King* also said, "The prosecution need not prove the defendant's knowledge of the rifle's precise length. Short-barreled rifles are illegal simply because they are short, which makes them 'suitable for unlawful purposes because of their concealability and ease of handling.' [Citations.] A person possessing a short-barreled rifle, and having actually observed the weapon, necessarily knows of its shortness, and thus knows its illegal characteristic, whether or not the person knows how many inches long the weapon is. That is particularly true of the rifle in this case, the stock of which had been crudely sawed off to reduce its overall length. *To require the prosecution to prove that a defendant knows the precise length of a rifle prohibited by section 12020(a) would make convictions for possessing such weapons virtually impossible to obtain, because few criminals would take the time to measure their rifles*." (*King, supra*, 38 Cal.4th at pp. 627-628, italics added.)

Thus, the trial court did not err, and defendant's proffered pinpoint instruction was wrong. Defendant repeats his misguided position on appeal. He argues, "Even though the prosecution did not need to show that [defendant] knew the shotgun's precise length, it still had to show that the defendant knew of the illegal characteristic. [Citation.] What made this particular weapon illegal was its shortness, defined as less than 26 inches in overall length. Thus, the prosecution had to prove that [defendant] knew the shotgun was less than 26 inches." This argument is contrary to *King*.

Here, defendant considers it significant that there was no evidence he saw the shotgun, unlike the defendant in *King*. However, the evidence that the defendant saw the gun was critical in *King*, because the gun was found in the garage of a residence occupied by the defendant, his brother, and his mother. (*King, supra,* 38 Cal.4th at p. 620.) Here, the gun was found in defendant's bedroom under his bed. He was the only occupant of the bedroom, though there was some evidence that he had previously allowed two other

persons to share the room with him -- one who moved out two to three years before the police search, and another who moved out a year before the search.

There was evidence that anyone observing this shotgun would know it had been shortened, because the stock was crudely cut, patched with putty, and spray painted.

We conclude the trial court did not err in denying defendant's request for the pinpoint instruction. We need not address defendant's contention that he was prejudiced by instructional error.

## C. Specific Intent Instruction

Defendant argues the trial court had a sua sponte duty to instruct the jury that, in order to convict, it had to find "specific intent," i.e., that defendant specifically intended to possess a shotgun that was less than 26 inches. We disagree.

The trial court instructed the jury, pursuant to CALCRIM No. 251 as follows:

"The crime charged in this case requires proof of the union, or joint operation, of act and wrongful intent. [¶] For you to find a person guilty of the crime of possession of an illegal weapon as charged in Count 1 that person must not only intentionally commit the prohibited act, *but must do so with a specific intent or mental state. The act and the specific intent or mental state required are explained in the instruction for that crime or allegation.*"[15] (Italics added.)

---

[15] The pertinent portion of the pattern instruction reads in its unedited form as follows: ". . . but must do so with a specific (intent/ [and/or] mental state). The act and the specific (intent/ [and/or] mental state) required are explained in the instruction for that crime." As the guide for using CALCRIM makes clear, "When the user must choose one of two or more options in order to complete the instruction, the choice of necessary alternatives is presented in parentheses . . . ." (CALCRIM, Guide for Using Judicial Council of California Jury Instructions, p. xxiv.) Thus, CALCRIM No. 251 includes options for specific intent and specific mental state or both. The trial court should not have included the "specific intent" option in this instruction. As we have discussed, the charged offense includes a knowledge element. Knowledge is a mental state and thus, only the "specific mental state" option should have been used in the instruction.

Defense counsel argued to the trial court that referring the jury back to the main instruction was circular and confusing.

On appeal, defendant complains the trial court did not instruct the jury with the alternative paragraph of CALCRIM No. 251, that the "specific (intent/ [and/or] mental state) required for the crime of [insert name of offense] is [insert specific intent or mental state]." Defendant argues the trial court should have instructed on specific intent that the jury had to find that he specifically intended to possess a shotgun that was less than 26 inches. This argument fails for the same reason we reject the previous argument regarding knowledge.

We conclude there was no instructional error.

**DISPOSITION**

The judgment is affirmed.


      MURRAY      , J.


We concur:


   BLEASE      , Acting P. J.


   ROBIE      , J.

---

Defendant does not contend he was prejudiced by this error. Instead, he uses the error to advance an erroneous argument that the offense includes a specific intent element.