Filed 8/10/15

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re KEVIN F., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>KEVIN F.,<br><br>        Defendant and Appellant. | A140445<br><br>(San Francisco City & County Super. Ct. No. JW136391) |

After determining that defendant Kevin F. (Minor) committed robbery, the juvenile court declared Minor a ward of the court and placed him on probation with conditions. On appeal, Minor contends (1) there is insufficient evidence he committed robbery, and (2) the court's probation condition prohibiting him from possessing weapons is unconstitutionally vague and overbroad. In the unpublished portion of this opinion, we reject Minor's challenge to the sufficiency of the evidence. In the published portion of this opinion, we hold the challenged probation condition must be modified. We will affirm the judgment as modified.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.A.

# I.  BACKGROUND

## A.    The Robbery

On October 17, 2013, at about 11:00 p.m., Samuel Merlo boarded the J-Church Muni train at Church and Market Streets in San Francisco.  He sat down and took out his cell phone.  Merlo noticed a group of three or four young men sitting near him talking to each other.  At the jurisdictional hearing, Merlo identified Minor as one of the people in this group.  Minor was wearing a white shirt and a baseball cap.  Merlo stated the group also included a Latino male, an African-American male, and perhaps another person.  At the jurisdictional hearing, Merlo identified a photograph of a Latino male with a long ponytail as one of the people in the group.

Minor and the other members of the group began talking with Merlo.  Merlo told them his name was Sam, and Minor said his name was "Kev."  They spoke for 10 to 15 minutes.  Minor gave Merlo his phone number, which Merlo put in his phone.  Merlo was a social person and relatively new to San Francisco, and he thought Minor and his friends seemed nice.  Merlo and the others got off the train at the same station.  Merlo went into a liquor store, where he bought a pack of cigarettes.  The African-American male went into the store with Merlo.  After leaving the store, they rejoined the rest of the group, including Minor, who had waited a bit further down the sidewalk.

Merlo felt comfortable with Minor and the other men in the group.  They walked together in the direction of Merlo's house.  As they were walking and talking, the street "suddenly an[d] inconspicuously turn[ed] into an alley."  The alley was dark.  Merlo stated, "[The alley was] somewhat paved, somewhat not. . . . It turned from a normal residential street with a nice sidewalk to an alley that's unkempt."  The young men were laughing and talking.  Merlo stated, "there was no intensity," and "there was no shift or there was no sign to me that something was about to happen."

Merlo was walking to the right of the others, and the man with the ponytail was closest to him.  Minor was still with the group.  When they were in the alley, the man with the ponytail suddenly got behind Merlo, "quickly reached around with his left arm, grabbed [Merlo] by the neck, and yelled, get him."  The other young men rushed Merlo

2

and pushed him so he was bent forward at the waist and facing the ground, although he remained on his feet. Merlo believed everyone in the group pushed him. He "was pushed by everyone forward, and then bent forward, they all came on top of me, and then I was punched from several directions." The young men punched Merlo more than four times (all in the head), including punching his left eye and his jaw. Merlo could not identify any individual as doing a particular act, but he believed each man was participating in the assault because he was "being punched in different directions." Merlo did not see any of the men not punching him. He did not hear anyone in the group tell the others to stop.

The attackers took everything out of Merlo's pants pockets. As they did so, they described the items, including his wallet, cell phone and keys. Merlo begged them to return the keys. The man with the ponytail asked Merlo what kind of car he drove. Merlo said it was "just a piece of shit." Someone eventually put the keys back in Merlo's pocket. No one returned Merlo's wallet or phone. Merlo heard all of the men speaking, but was unsure as to who said what. Merlo recalled the man with the ponytail put him in a chokehold, said to "get him," and asked Merlo about his keys and what kind of car he drove. Other than that, Merlo could not specify what each participant said.

The man holding Merlo's neck let go. The group ran down the alley, and Merlo chased them. One of the men fell on his stomach, and the man with the ponytail who had been choking Merlo turned around, faced Merlo, and took an aggressive stance. Merlo stepped back. The person who had fallen got up, and he and the man with the ponytail started running again. Merlo continued to chase them, yelling that he was "just like [them]" and needed his phone and wallet. Merlo caught up with the men at the end of the alley. The man with the ponytail turned around again and said, "I got a knife." He pulled out a knife and flipped it open. Merlo put up his arms and stepped back. By then, the others, including Minor, had turned to the left and continued running. The man with the ponytail, after displaying the knife, ran after the others. Merlo stopped chasing them.

Police arrived. They told Merlo they were going to drive him around and show him a few people, to see if any of them looked like the people involved in the incident.

3

Merlo told police some of the people they saw during the drive were not involved. Merlo saw and identified the Latino man who had grabbed him by the throat. Merlo also saw Minor and recognized his shirt and baseball cap. Merlo told the police, "That's Kev. That's Kev. I know him." When the police detained Minor, they did not find any weapons or any of Merlo's stolen property on him. An ambulance arrived at the scene of the incident, but Merlo refused to ride to the hospital. He did go to the hospital later. It took about two weeks for the bruises on his face to heal, and he still had a scar on his forehead at the time of the jurisdictional hearing. He suffered a black eye. Because of the punch to his jaw, it took a week before Merlo was comfortable eating.

## B.     Procedural Background

The San Francisco District Attorney filed a juvenile wardship petition (Welf. & Inst. Code, § 602, subd. (a)), alleging Minor committed second degree robbery (Pen. Code, §§ 211, 212.5, subd. (c)). After a contested jurisdictional hearing, the juvenile court sustained the petition. At the subsequent dispositional hearing, the court declared Minor a ward, placed him on probation on condition that he successfully complete a ranch school program, and imposed probation conditions, including a prohibition on weapons possession. Minor appealed.

## II.  DISCUSSION

### A.     Sufficiency of the Evidence

#### 1.     Standard of Review

"Our review of [Minor's] substantial evidence claim is governed by the same standard applicable to adult criminal cases. [Citation.] 'In reviewing the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.]' [Citation.] ' "[O]ur role on appeal is a limited one." [Citation.] Under the substantial evidence rule, we must presume in support of the judgment the existence of every fact that the trier of fact could reasonably have deduced from the evidence. [Citation.] Thus, if the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the

4

circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment. [Citation.]' [Citation.]" (*In re V.V.* (2011) 51 Cal.4th 1020, 1026.) Before the judgment of the trial court can be set aside for insufficiency of the evidence, "it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) An appellate court may not reevaluate the credibility of witnesses. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

### 2.      Substantial Evidence Supports the Juvenile Court's Finding

Substantial evidence supports the juvenile court's determination Minor participated in, or aided and abetted, the robbery of Merlo. " 'Robbery is the taking of "personal property in the possession of another against the will and from the person or immediate presence of that person accomplished by means of force or fear and with the specific intent permanently to deprive such person of such property." ' " (*People v. Clark* (2011) 52 Cal.4th 856, 943.) "[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.)

Although Merlo could not see which individual took each action (such as punching his jaw or taking his wallet), the evidence supports a conclusion Minor personally participated in the attack on Merlo. Merlo testified Minor was one of the young men he met on the Muni train. Minor conversed with Merlo, providing his name and a phone number. Minor was still with the group when they got off the train, and he and the Latino man with the ponytail waited outside while Merlo went into a liquor store to buy cigarettes. Minor was still with the group when the young men walked toward Merlo's house and entered the dark alley, where the Latino man grabbed Merlo's neck and the other young men began pushing and punching Merlo. Merlo believed everyone pushed him, and he felt punches from several directions. He did not hear anyone in the group tell the others to stop. After the attackers had taken Merlo's wallet and phone, they

5

fled by running down the alley and turning left at the end of the alley. Minor was in the group that fled and turned left. Merlo's testimony that Minor was with the group before, during and after the attack, along with Merlo's testimony about the attack itself (i.e., the young men punched him from different directions, and no one left or tried to stop the others), allows a reasonable inference that Minor participated in the attack.

In any event, substantial evidence supports the juvenile court's conclusion that Minor, at a minimum, aided and abetted the robbery of Merlo. Minor argues his "mere presence" in the alley during the robbery is insufficient to establish he aided and abetted the crime. While mere presence at a crime scene or failure to prevent a crime is not sufficient to prove guilt, such factors may be considered with other evidence in passing on guilt or innocence. (*People v. Durham* (1969) 70 Cal.2d 171, 181.) Among the factors a trier of fact may consider in determining whether a defendant aided and abetted a crime are " 'presence at the scene of the crime, companionship, and conduct before and after the offense.' " (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.) "In addition, flight is one of the factors which is relevant in determining consciousness of guilt." (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1095.) Whether a person has aided and abetted in the commission of a crime ordinarily is a question of fact. (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5.) Accordingly, on appeal, all conflicts in the evidence and attendant reasonable inferences are resolved in favor of the judgment. (*Ibid.*)

Here, the evidence is sufficient to support a reasonable inference that Minor intended to facilitate or encourage the robbery and engaged in conduct that did so. As noted, Minor was with the group of young men before, during and after the attack on Merlo. Although Minor suggests he may not have been a member of a "group" of companions or friends, the evidence supports a contrary conclusion and shows he did not just happen upon the scene of a crime. Minor and the other young men were talking to each other on the train when Merlo first encountered them; they all got off the train together; Minor and the Latino man were together while Merlo and the African-American man went into the liquor store; and Minor and the others continued talking together when they walked toward Merlo's house and into the dark alley. Minor did not try to stop the

6

attack. Minor then fled with the other young men, all of whom ran down the alley and turned left.

A reasonable trier of fact could infer from this evidence that Minor and the others were companions acting in concert according to a common plan to rob Merlo, and that Minor harbored the intent to encourage or facilitate the robbery. Moreover, a reasonable trier of fact could infer that, even if Minor did not personally hit Merlo or take his belongings, Minor assisted the participants by remaining present to serve as a lookout or to prevent Merlo from escaping if he should break free from his attackers. (See *In re Gary F.* (2014) 226 Cal.App.4th 1076, 1080–1081 [evidence supported inference minor acted as lookout where minor was present at scene of burglary and whistled when neighbor approached]; *People v. Campbell, supra,* 25 Cal.App.4th at p. 409 [jury could conclude defendant assumed position near victims to "intimidate and block them" and "watch out for others who might approach"]; *In re Lynette G., supra,* 54 Cal.App.3d at p. 1095 [minor's presence at scene of robbery, and her flight with perpetrator and two others, supported finding she aided and abetted the robbery].)

In his reply brief, Minor argues the evidence does not show he was still with the group of young men when they entered the alley or when they ran away after the attack on Merlo. This is incorrect. As noted, Merlo testified (1) Minor was still with the group when the Latino man grabbed Merlo and the others began pushing and hitting him, and (2) Minor ran away with the group and turned left. To the extent Minor argues Merlo was uncertain or "evasive" on these points (such as being unable to remember exactly where Minor was in the group of young men as they walked into the alley), such criticisms provide no basis for holding the juvenile court could not credit Merlo's testimony that Minor was still present.

Similarly, Minor's argument that Merlo's ability to perceive events was limited—because he had been drinking before he boarded the train, the alley was dark, and his vision was obstructed because he was bent over and facing the ground during the attack—does not show the evidence is insufficient to support the juvenile court's findings. The court found Merlo was an honest and credible witness (in part because he

7

acknowledged the limitations on what he could see during the attack), and Minor disavows any challenge to Merlo's credibility. For the reasons stated above, Merlo's testimony as to what he did perceive before, during and after the attack provides substantial evidence supporting the finding that Minor participated in, or aided and abetted, the robbery.

Finally, *In re Y.R.* (2014) 226 Cal.App.4th 1114, on which Minor relies, is inapposite. The appellate court in that case found insufficient evidence to support a finding that the minor (Y.R.), who was present when her boyfriend broke the doors of a condominium clubhouse bathroom, had herself committed vandalism. (*Id.* at pp. 1121– 1122.) It was undisputed that Y.R. did not herself damage the bathroom doors. (*Id.* at p. 1121.) Here, in contrast, the evidence outlined above supports a reasonable inference that Minor personally participated in the robbery. Moreover, as to aiding and abetting, the appellate court in *In re Y.R.* concluded the evidence that Y.R. knew her boyfriend intended to break the doors was tenuous, and there was no evidence she aided him or encouraged him to do it. (*Id.* at p. 1122.) In particular, it was "an unwarranted leap in logic to maintain that Y.R.'s statement that she was cold emboldened [her boyfriend] to break the bathroom doors and it was Y.R.'s intent to encourage him to do so." (*Ibid.*) Here, for the reasons discussed above, we conclude the evidence of Minor's presence and conduct before, during and after the attack on Merlo supports a reasonable inference that he and the other young men were companions with a common purpose to rob Merlo, and that Minor assisted in the robbery.

**B.      The Weapon Condition**

**1.      Background**

The court placed Minor on probation on condition that he successfully complete a ranch school program. At the disposition hearing, the court told Minor: "You're not to possess any weapons. You're not to possess any toys that look like weapons." The court's printed dispositional findings, which the court signed, specify probation conditions, including the requirement that Minor "[n]ot possess weapons of any kind,

which means no guns, knives, clubs, brass knuckles, attack dogs, ammunition, or something that looks like a weapon.  You are not to possess anything that you could use as a weapon or someone else might consider to be a weapon."

## 2.    Analysis

Minor contends the weapon condition is unconstitutionally vague and overbroad. Under Welfare and Institutions Code section 730, subdivision (b), a juvenile court may impose "any and all reasonable conditions that it may determine fitting and proper to the end that justice may be done and the reformation and rehabilitation of the ward enhanced."  In spite of the juvenile court's broad discretion, "[a] probation condition 'must be sufficiently precise for the probationer to know what is required of him, and for the court to determine whether the condition has been violated,' if it is to withstand a challenge on the ground of vagueness.  [Citation.]  A probation condition that imposes limitations on a person's constitutional rights must closely tailor those limitations to the purpose of the condition to avoid being invalidated as unconstitutionally overbroad."  (*In re Sheena K.* (2007) 40 Cal.4th 875, 890 (*Sheena K.*).)  A defendant may contend for the first time on appeal that a probation condition is unconstitutionally vague or overbroad on its face when the challenge presents a pure question of law that the appellate court can resolve without reference to the sentencing record.  (*Id.* at pp. 887–889; *People v. Quiroz* (2011) 199 Cal.App.4th 1123, 1127.)[1]

The prohibition on vagueness is rooted in " 'ordinary notions of fair play and the settled rules of law,' and a statute that flouts it 'violates the first essential of due

---

[1] Minor frames his argument in terms of both vagueness and overbreadth, without clearly distinguishing between the two.  The overbreadth cases involve probation conditions that indiscriminately cover constitutionally protected activity along with conduct that is legitimately a matter of probationary oversight.  Under the overbreadth doctrine, courts test the challenged language for whether it is narrowly enough drawn to its legitimate purposes without unduly infringing constitutional protections.  (See *Sheena K.*, *supra*, 40 Cal.4th at p. 890 [summarizing overbreadth doctrine].)  Minor does not develop any argument that the probation condition at issue covers constitutionally protected activity and is thus overbroad.

9

process.' " (*Johnson v. United States* (2015) 576 U.S. ___, ___ [135 S.Ct. 2551, 2557].) This concern for fair warning is aimed at ensuring that a " 'person of ordinary intelligence [has] a reasonable opportunity to know what is prohibited, so that he may act accordingly.' " (*Hoffman Estates v. Flipside, Hoffman Estates, Inc.* (1982) 455 U.S. 489, 498, quoting *Grayned v. City of Rockford* (1972) 408 U.S. 104, 108.)  The fear is that vague laws will " 'trap the innocent.' " (455 U.S. at p. 498.)  More broadly, " ' "a law that is 'void for vagueness' . . . 'impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.' " ' " (*In re H.C.* (2009) 175 Cal.App.4th 1067, 1070.)

Arguing that the juvenile court's oral statement prohibiting possession of "any weapons" or "any toys that look like weapons" does not provide an explicit standard for determining which objects are prohibited, Minor asks us to modify the condition to prohibit possession of "*dangerous or deadly* weapons." (Italics added.)  In response, the Attorney General makes no contention that the court's oral statement, standing alone, is sufficiently precise to meet constitutional requirements, and we interpret her position as an implicit concession on this point.  The Attorney General argues, however, that the more detailed written condition in the court's printed dispositional findings clarifies the prohibition by specifying which items are forbidden, i.e., "guns, knives, clubs, brass knuckles, attack dogs, ammunition," so there is no need to rewrite the condition to prohibit possession of deadly or dangerous weapons.  (See *Sheena K.*, *supra*, 40 Cal.4th at p. 891 [a probation condition that otherwise would be deemed vague may be constitutional because the juvenile court offered additional oral or written comments clarifying the condition].)  We agree the court's written condition (with modifications we discuss below) is sufficiently precise for Minor to know what is required of him.[2]

---

[2] Minor urges us to focus solely on the juvenile court's brief oral statement, rather than the more detailed written condition.  We need not determine whether in the circumstances of this case the court's oral statement supersedes, or just summarizes, the written statement in the printed dispositional findings signed by the court.  (See *People v.*

In support of his request that we modify the condition to prohibit possession of only "dangerous or deadly" weapons, Minor relies on *In re R.P.* (2009) 176 Cal.App.4th 562. In that case, the court concluded that a probation condition prohibiting a minor from possessing any " 'dangerous or deadly weapon' " gave sufficient warning as to the conduct that might result in a violation, and hence was not unconstitutionally vague. (*Id.* at p. 565.) The court reasoned, "[c]ase law confirms the plain meaning definition of 'deadly weapon' as ' "*any object, instrument, or weapon which is used in such a manner as to be capable of producing, and likely to produce, death or great bodily injury.*" [Citation.]' [Citation.] This definition encompasses inherently deadly items such as dirks and blackjacks which are specifically designed as weapons and are thus 'deadly weapons' as a matter of law, *as well as other items that are not deadly per se but which may be used in a manner likely to cause death or great bodily injury.*" (*Id.* at p. 567.) The court also looked to pattern jury instructions and Black's Law Dictionary, all of which defined dangerous and deadly weapons, concluding that the term "dangerous or deadly weapon" was well-defined and "clearly established in the law." (*In re R.P., supra,* at pp. 567–568.) As a result, the court held, "the 'no-dangerous-or-deadly-weapon' probation condition [was] sufficiently precise for [the minor] to know what is required of him." (*Id.* at p. 568.)

In this case, the omission of "dangerous or deadly" does not render the juvenile court's weapons prohibition unconstitutionally vague. The classic statement of what constitutes a dangerous or deadly weapon in California criminal law dates back to *People v. Raleigh* (1932) 128 Cal.App. 105, 107 (*Raleigh*), where the defendant appealed his conviction for attempting to rob a haberdashery with an unloaded gun. "There are," the

*Gabriel* (2010) 189 Cal.App.4th 1070, 1073 [oral probation conditions controlled]; *People v. Pirali* (2013) 217 Cal.App.4th 1341, 1346 [whether oral or written conditions prevail depends on circumstances of case]; *People v. Thrash* (1978) 80 Cal.App.3d 898, 901 [probation conditions "need not be spelled out in great detail in court as long as the defendant knows what they are"].) Even assuming Minor is correct that the court's oral statement is the operative condition, we modify it to read as stated in the printed findings (subject to the further modifications we discuss below), based on the Attorney General's implicit concession that the oral statement standing alone is insufficiently precise.

11

Court of Appeal explained in *Raleigh,* "first, those instrumentalities which are weapons in the strict sense of the word, and, second, those instrumentalities which are not weapons in the strict sense of the word, but which may be used as such. The instrumentalities falling in the first class, such as guns, dirks and blackjacks, which are weapons in the strict sense of the word and are 'dangerous or deadly' to others in the ordinary use for which they are designed, may be said as a matter of law to be 'dangerous or deadly weapons.' This is true as the ordinary use for which they are designed establishes their character as such." (*Id.* at p. 108.) In some circumstances, however, "instrumentalities falling in the second class, such as ordinary razors, pocket-knives, hatpins, canes, hammers, hatchets and other sharp or heavy objects" are "capable of being used in a 'dangerous or deadly' manner, and it may be fairly inferred from the evidence that [the] possessor [of such an object] intended on a particular occasion to use it as a weapon," thus establishing its character as a weapon as a matter of fact. (*Id.* at pp. 108–109.) Applying this dichotomy, the *Raleigh* court held that, because the gun used by the defendant in that case was a dangerous or deadly weapon per se, it was not necessary for the trial court to instruct on and submit the issue to the jury for factual determination.[3] (*Id.* at pp. 110–111.)

In this case, the juvenile court's approach to the weapons prohibition imposed on Minor begins by listing a number of specific items and instruments that will categorically fall within the prohibition ("guns, knives, clubs, brass knuckles, attack dogs, ammunition"), but then leaves the prohibition open-ended in a manner that could capture other things ("something that looks like a weapon" or "anything that you could use as a weapon or someone else might consider to be a weapon") depending on the circumstances. This generally follows the established *Raleigh* two-step test for dangerous or deadly weapons. Under that test, the notion that an instrument or object must be either "dangerous or deadly" in order to qualify as a "weapon" is so fundamental

_____

[3] *Raleigh* was followed by the California Supreme Court in *People v. McCoy* (1944) 25 Cal.2d 177, 188, *People v. Grubb* (1965) 63 Cal.2d 614, 621, fn. 8 (*Grubb*), and *People v. Graham* (1969) 71 Cal.2d 303, 327–328 (*Graham*).

that it need not be stated explicitly.  (See *People v. Pruett* (1997) 57 Cal.App.4th 77, 86 ["Because the use of [a pocket knife] with the intent to resist arrest or detention necessarily encompasses its use or intended use as a weapon, no definition of 'weapon' or 'deadly weapon' is required"].)  Because the qualifier "dangerous or deadly" inheres in the commonly understood meaning of the term "weapon" (see Black's Law Dict. (10th ed. 2014) p. 1827 ["[a]n instrument used or designed to be used to injure or kill someone"]), we agree with the Attorney General that it is implicit in the probation condition as phrased by the court.  Even without the qualifier Minor seeks, a reasonable person can understand the plain meaning of the term "weapon."

For other reasons, however, we agree with Minor that the prohibition on "possess[ing] anything that [he] could use as a weapon" does not provide adequate notice of the prohibited conduct.  First, as worded, the condition is broad enough to include any object that *could* injure someone, even an ordinary household object, regardless of Minor's intent in possessing it.  A condition framed that broadly certainly could accord with the settled meaning of "weapon" and related terms in case law,[4] but it omits an idea

---

[4] (See, e.g., *In re David V.* (2010) 48 Cal.4th 23, 24–25, 30, fn. 5 [bicycle footrest]; *In re Martin Alonzo L.* (2006) 142 Cal.App.4th 93, 95, 97 [wallet with protruding metal spikes]; *People v. Davis* (2013) 214 Cal.App.4th 1322, 1324–1325, 1328–1329 [baseball bat]; *People v. Fannin* (2001) 91 Cal.App.4th 1399, 1400, 1405 [bicycle lock on a chain]; *People v. Nelums* (1982) 31 Cal.3d 355, 360 [inoperable firearm]; *People v. Helms* (1966) 242 Cal.App.2d 476, 486–487 [pillow]; *People v. Burns* (1969) 270 Cal.App.2d 238, 254 [pellet gun]; *Graham, supra,* 71 Cal.2d at pp. 327–328 [shoe]; *People v. Page* (2004) 123 Cal.App.4th 1466, 1473 [pencil]; *People v. Claborn* (1964) 224 Cal.App.2d 38, 42 [automobile]; *People v. Russell* (1943) 59 Cal.App.2d 660, 665 [fingernail file]; *People v. Richardson* (1960) 176 Cal.App.2d 238, 239 [razor blade]; *People v. Lee* (1937) 23 Cal.App.2d 168, 170 [iron bar]; *People v. Simons* (1996) 42 Cal.App.4th 1100, 1107 [screwdriver]; *People v. Williams* (1929) 100 Cal.App. 149, 151–152 [wrench]; see also *Grubb, supra,* 63 Cal.2d at pp. 619–620 [rejecting contention that the term "billy" in former Penal Code section 12020 is unconstitutionally vague because it "encompasses such ordinary objects as an orthodox baseball bat, a table leg, or a piece of lumber; even though these objects find their most common use in a peaceful and traditionally acceptable way, all of them could be used as weapons of physical violence"]; *id.* at p. 620, fn. 7 [listing examples of cases involving criminal convictions

13

that is essential to *Raleigh's* second category—that of de facto weapons. "[A]n item commonly used for a nonviolent purpose, such as a baseball bat or a table leg, could qualify as a [dangerous or deadly weapon] . . . only 'when the attendant circumstances, including the time, place, destination of the possessor, the alteration of the object from standard form, and other relevant facts indicate[] that the possessor would use the object for a dangerous, not harmless, purpose.' " (*People v. King* (2006) 38 Cal.4th 617, 624 (*King*), citation omitted.) Because what is and what is not a de facto weapon turns in part on intent to use the item for a dangerous or deadly purpose, we will order the condition modified to prohibit Minor from possessing any object that he *intends* to use as a weapon.

Second, the above portion and other portions of the weapons possession prohibition must be modified to include a scienter requirement. "California appellate courts have found probation conditions to be unconstitutionally vague or overbroad when they do not require the probationer to have knowledge of the prohibited conduct or circumstances." (*People v. Kim* (2011) 193 Cal.App.4th 836, 843.) For example, in *Sheena K.*, our Supreme Court held that, in the absence of an express knowledge requirement, a probation condition limiting association with anyone disapproved of by probation was unconstitutionally vague. (*Sheena K., supra,* 40 Cal.4th at pp. 891–892.) Without the addition of an express knowledge requirement, the Court reasoned, the ban did not provide the probationer with advance notice as to the persons with whom she could not associate. (*Ibid.*) Where a probation condition suffers from this defect, the appellate court may modify the condition to include the missing knowledge requirement. (See *id.* at p. 892; see also *In re Victor L.* (2010) 182 Cal.App.4th 902, 912–913, 931 (*Victor L.*) [modifying probation condition prohibiting presence where dangerous or deadly weapons, firearms, or ammunition exist to include express knowledge requirement]; *People v. Freitas* (2009) 179 Cal.App.4th 747, 752–753 [modifying probation condition to specify that defendant not *knowingly* possess guns or ammunition].)

---

for unlawful possession of ordinary objects "whose likely criminal use clearly appears from the character of the weapon alone"].)

14

Citing *People v. Moore* (2012) 211 Cal.App.4th 1179 (*Moore*), the Attorney General argues that a probation condition lacking an express scienter requirement is not unconstitutionally vague. So long as a probation condition "clearly specif[ies] what conduct [is] prohibited," *Moore* holds that "the requirement that a violation of the weapons condition must be willful and knowing adequately protects [the probationer] from being punished for innocent possession." (*Id.* at p. 1188.) "The addition of an express knowledge requirement would add little or nothing to the probation condition," in this view. (*Ibid.*) Division One of this District and a panel of the Sixth District Court of Appeal recently adopted the same approach. (*People v. Hall* (2015) 236 Cal.App.4th 1124, 1134 (*Hall*) ["We see no reason why probation conditions would need to articulate mens-rea requirements expressly when criminal statutes need not"]; *People v. Contreras* (2015) 237 Cal.App.4th 868, 887 (*Contreras*) [following *Hall*].)[5] These cases appear to presuppose that the requisite element of mens rea for proof of a violation is readily ascertainable in advance. It is not.

The statutes governing revocation of juvenile and adult probation do not specify that only a willful violation can result in revocation. Welfare and Institutions Code section 777, which governs the juvenile court equivalent of probation revocation proceedings in adult criminal cases, specifies only that the probation officer or the

---

[5] Frustrated with the "dismaying regularity" of having to "revisit the issue in orders of probation," the Third District Court of Appeal has decided that it will eschew case-by-case scrutiny of the specific language at issue and "construe every probation condition proscribing a probationer's presence, possession, association, or similar action to require the action be undertaken knowingly." (*People v. Patel* (2011) 196 Cal.App.4th 956, 960 (*Patel*).) This is the opposite of the approach endorsed in *Moore*, *Hall* and *Contreras*. Rather than treat the addition of a knowledge requirement as categorically unnecessary so long as the prohibited conduct is delineated clearly, *Patel* categorically includes a knowledge requirement in all cases. We respectfully decline to follow either approach. It is unavoidable, we think, that evaluation of probation conditions in appeals involving facial vagueness challenges must be undertaken on a case-by-case basis. We note that a case currently pending before our Supreme Court presents the question whether certain no-contact probation conditions must be modified to include an explicit knowledge requirement. (*In re A.S.*, review granted Sept. 24, 2014, S220280.)

15

prosecuting attorney may file a "notice" that "alleges a violation of a condition of probation not amounting to a crime. The notice shall contain a concise statement of facts sufficient to support this conclusion." (Welf. & Inst. Code, § 777, subd. (a)(2).) "The facts alleged in the notice shall be established by a preponderance of the evidence at a hearing to change, modify, or set aside a previous order." (Welf. & Inst. Code, § 777, subd. (c).) Under Penal Code section 1203.2, subdivision (a), which applies to adult probationers, probation may be revoked "if the interests of justice so require and the court, in its judgment, has reason to believe from the report of the probation . . . officer or otherwise that the person has violated any of the conditions of his or her supervision, has become abandoned to improper associates or a vicious life, or has subsequently committed other offenses, regardless whether he or she has been prosecuted for such offenses."

Ultimately, the determination whether to revoke probation is committed to the sound discretion of the court. (*People v. Zaring* (1992) 8 Cal.App.4th 362, 378 (*Zaring*).) While it is an abuse of discretion to revoke probation for conduct over which the probationer has no control (*People v. Cervantes* (2009) 175 Cal.App.4th 291, 295 [inability of immigration detainee to appear for review hearing not willful]; *People v. Galvan* (2007) 155 Cal.App.4th 978, 982–984 [because defendant was deported immediately following his release from county jail, his failure to report to probation department within 24 hours of release from county jail was not willful]), the mens rea standard in revocation proceedings is difficult to state with precision beyond that. (See *Zaring, supra,* 8 Cal.App.4th at p. 379 [absent "irresponsibility, contumacious behavior or disrespect for the orders and expectations of the court," probationer's conduct was not willful].) Because " '[t]he terms "willful" or "willfully" . . . imply "simply a purpose or willingness to commit the [prohibited] act . . . ," *without regard to motive, intent to injure, or knowledge of the act's prohibited character'* " (*Hall*, *supra*, 236 Cal.App.4th at p. 1133, italics added, quoting *In re Jerry R.* (1994) 29 Cal.App.4th 1432, 1438; see Pen. Code, § 7, item 1), the standard offers little protection against unwitting violation.

16

Nor does it help to look beyond the statutes for case law construction of what "willful" means. " '[W]illful' is a word 'of many meanings, its construction often being influenced by its context.' " (*Screws v. United States* (1945) 325 U.S. 91, 101, quoting *Spies v. United States* (1943) 317 U.S. 492, 497.) "Few areas of criminal law pose more difficulty than the proper definition of the *mens rea* required for any particular crime." (*United States v. Bailey* (1980) 444 U.S. 394, 403.) "For several centuries (at least since 1600) the different common law crimes have been so defined as to require, for guilt, that the defendant's acts or omissions be accompanied by one or more of the various types of fault (intention, knowledge, recklessness or—more rarely—negligence)[.]" (1 LaFave, Substantive Criminal Law (2d ed. 2003) § 5.5, p. 381.) In some circumstances, the mens rea required to sustain a criminal conviction is simply conscious carrying out of the prohibited act, while in other circumstances some level of awareness of wrongdoing will be required. (See *Elonis v. United States* (2015) 575 U.S. ___, ___ [135 S.Ct. 2001, 2010].)[6]

To sharpen the uncertain boundaries of criminal statutes that require proof of nothing more than willfulness as a predicate to violation, courts have often adopted limiting constructions requiring actual knowledge of wrongdoing beyond the basic level of mens rea that is impliedly required for all criminal conduct. (E.g., *People v. Garcia* (2001) 25 Cal.4th 744, 752 [" 'willful[]' " omission requires knowledge of legally required act]; *People v. Simon* (1995) 9 Cal.4th 493, 507, 522 ["willful" violation of California securities disclosure statute prescribing criminal penalties construed to require finding of knowledge of the falsity or misleading nature of charged misrepresentations or omissions, or criminal negligence in failing to acquire knowledge]; see *Liparota v. United States* (1985) 471 U.S. 419, 426 [limiting construction requiring that defendant

---

[6] (Compare *United States v. Freed* (1971) 401 U.S. 601, 607–610 [conviction for failure to register possession of hand grenades does not require knowledge of wrongfulness or any other criminal intent] with *Staples v. United States* (1994) 511 U.S. 600, 609, 620 (*Staples*) [conviction for possession of unregistered machine gun requires proof that the defendant knew "the particular characteristics that make his weapon a statutory firearm"].)

had actual knowledge that his conduct was unauthorized or illegal "is particularly appropriate where, as here, to interpret the statute otherwise would be to criminalize a broad range of apparently innocent conduct"].)

It is true, as the panel in *Hall* recently observed, there is no requirement that criminal statutes expressly set forth a mens rea element. (*Hall*, *supra*, 236 Cal.App.4th at p. 1134.) But it is also true that courts often interpret statutes to require some degree of knowledge of wrongdoing where the governing statutory language is silent—as is the case inWelfare and Institutions Code section 777 and Penal Code section 1203.2—with respect to the requisite level of culpable intent. Over the last two decades, our Supreme Court has decided a series of cases addressing what level of "guilty knowledge" must be shown to support a conviction in cases where the statute at issue is silent on that issue. In the most recent of these cases, *Stark v. Superior Court* (2011) 52 Cal.4th 368 (*Stark*), the Court explained that "we have construed criminal statutes to include a guilty knowledge requirement even though the statutes did not expressly articulate such a requirement. . . . [I]n some cases we have required actual knowledge of the material facts that demonstrate wrongful intent. In other cases, we have concluded that actual knowledge or some form of negligence in failing to know the material facts is required." (*Stark, supra,* 52 Cal.4th at p. 393; see *People v. Salas* (2006) 37 Cal.4th 967, 974–975, 981; *King*, *supra*, 38 Cal.4th at pp. 622–623; *People v. Coria* (1999) 21 Cal.4th 868, 878; *In re Jorge M.* (2000) 23 Cal.4th 866, 872, 887; *People v. Rubalcava* (2000) 23 Cal.4th 322, 332 (*Rubalcava*); *People v. Garcia, supra,* 25 Cal.4th at p. 752.)

Two of the cases in this line of precedent, both involving illegal weapons possession under former Penal Code section 12020, subdivision (a)(1),[7] are pertinent here. In *King, supra,* 38 Cal.4th at p. 620, the Court held that to secure a conviction for

---

[7] In a 2010 enactment that took effect January 1, 2012, "former [Penal Code] section 12020 [citation], prohibiting possession of a wide variety of weapons, was repealed and recodified in a nonsubstantive reorganization which divided former [Penal Code] section 12020 into new numbered sections." (*People v. Brown* (2014) 227 Cal.App.4th 451, 454, fn. 1.)

18

possession of a short-barreled firearm, the prosecution "must prove the possessor's knowledge of the weapon's illegal characteristics." And in *Rubalcava*, *supra*, 23 Cal.4th at pp. 328, 332, the Court held that, even though conviction for possession of a concealed dirk or dagger does not require specific intent to stab anyone with such an instrument, the "defendant must still have the requisite *guilty mind:* that is, [he] must knowingly and intentionally carry concealed upon his or her person an instrument 'that is capable of ready use as a stabbing weapon.' [Citation.] A defendant who does not know that he is carrying the weapon or that the concealed instrument may be used as a stabbing weapon is therefore not guilty of violating [former Penal Code] section 12020." Striking a theme introduced by the high court in *Staples*—which involved failure to register a firearm—in both *King* and *Rubalcava* the California Supreme Court found it notable that the possessory crime at issue covered " ' "traditionally lawful conduct." ' " (*Rubalcava*, *supra*, 23 Cal.4th at p. 331; see *King*, *supra*, 38 Cal.4th at p. 624.) When that is the case, as it is here, given the breadth of what might be considered a "weapon," see *ante* at fn. 4, a requirement of actual knowledge of the character of the weapon is appropriate to avoid criminalizing innocent conduct. (See *King*, *supra*, 38 Cal.4th at p. 626 ["[i]t is highly unlikely that the Legislature intended that a person possessing an item listed in [former Penal Code section 12020, subdivision (a)(1)] for its lawful, utilitarian purpose, but unaware of the characteristic that makes possession of the item illegal, would nevertheless be guilty of violating [former Penal Code section 12020, subdivision (a)(1)]"].)

Accordingly, we will require modification to add a scienter requirement. With the other clarifications we have required, a probationer can easily understand the type of conduct that is proscribed (i.e., he may not possess weapons). But the difficulty of defining with perfect clarity every potential item that might be considered a weapon illustrates why more warning is necessary. To provide adequate protection against unwitting violations, the probationer must engage in the proscribed conduct *knowingly* (i.e., with actual intent and understanding that he possesses something constituting a weapon). Particularly since there is a conditional liberty interest at stake, we think the

19

addition of an express knowledge requirement making the scope of the prohibited conduct clear in advance to all who may be involved—to probationers, to law enforcement officers, to probation departments, and to juvenile courts—best comports with due process. (See *Victor L., supra,* 182 Cal.App.4th at pp. 912–913 [modifying probation condition barring probationer from remaining in location where weapons are present to add explicit knowledge requirement, and explaining "[d]ue process requires . . . that the probationer be informed *in advance* whether his conduct comports with or violates a condition of probation"].)

## III. DISPOSITION

The weapon probation condition is modified to read: "The minor shall: . . . Not knowingly possess weapons of any kind, which means no guns, knives, clubs, brass knuckles, attack dogs, ammunition, or something that looks like a weapon. In addition, you are not to knowingly possess anything that you intend to use as a weapon or that you know someone else might consider to be a weapon." As so modified, the judgment is affirmed.

_____

Streeter, J.

We concur:

_____

Ruvolo, P. J.

_____

Reardon, J.

A140445/*In re Kevin F.*

21

_In re Kevin F._ (A140445)


Trial Court:                             San Francisco County Superior Court


Trial Judge:                            Hon. Susan M. Breall


Counsel for Defendant and Appellant:      Leila H. Moncharsh, by appointment of the Court of Appeal under the First District Appellate Project's Assisted-Case System


Counsel for Plaintiff and Respondent:      Kamala D. Harris
Attorney General of California

Gerald A. Engler
Senior Assistant Attorney General

Eric D. Share
Supervising Deputy Attorney General

Sharon G. Birenbaum
Deputy Attorney General