Filed 3/30/16  P. v. Rosello CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B263840 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA079747) |
| v. | |
| SCOTT ROSELLO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Michael V. Jesic, Judge.  Affirmed as modified.

Sally Patrone Brajevich, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Scott Rosello (defendant) appeals from the judgment entered upon a plea of no contest to unlawful possession of a firearm, ammunition, and a controlled substance. He contends that the trial court erred in denying his motion to suppress evidence, and he challenges several probation conditions as unconstitutionally vague. We find no error in the denial of defendant's suppression motion, but agree that the challenged probation conditions should be modified. We thus affirm the judgment as modified.

## BACKGROUND

Defendant was charged by information with the following three felonies: count 1, possession of a firearm by a felon in violation of Penal Code section 29800, subdivision (a)(1);[1] count 2, possession of ammunition in violation of section 30305, subdivision (a)(1); and count 3, possession of a controlled substance with an operable firearm in violation of Health and Safety Code section 11370.1, subdivision (a). Following the denial of defendant's motion to suppress evidence pursuant to section 1538.5, defendant entered a plea of no contest to all three counts. On April 14, 2015, the trial court suspended imposition of sentence and placed defendant on formal probation for a period of three years upon specified conditions, including that he serve 358 days in jail, with a combined total of 358 days of custody credit.

Defendant filed a timely notice of appeal from the judgment.

**Prosecution evidence**

Los Angeles Police Officer Gus Ramirez testified that he was assigned to the Department's Parole Compliance Unit to conduct "compliance checks" of probationers who were subject to search and seizure conditions of probation. The compliance checks consisted of observing the probationers' sleeping areas and any common areas to which they had access, and searching for contraband or weapons. On November 6, 2014, Officer Ramirez went to a residence on Jellico Avenue (Jellico house) with other police and probation officers, to conduct a compliance check at the address on record for

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

narcotics probationer Mario Hurtado (Hurtado), who had two outstanding felony arrest warrants. While there one of the officers recognized a vehicle registered to Thomas Slain (Slain), a probationer who was subject to search and seizure conditions and who also had an outstanding arrest warrant. After the homeowner responded to the officers' knock on the door, permission was given for them to look for Hurtado. He was found in one of several makeshift dwellings behind the Jellico house and then arrested. The officers also arrested another man who they found to be in possession of methamphetamine and determined to be "high."

Sandra Stallings (Stallings) was also discovered at the Jellico house, asleep in one of the makeshift dwellings. When asked whether she lived at a residence on White Oak Avenue (White Oak house), Stallings said she was "staying" there.[2] She told the officers that Slain was her brother, that he was staying at the White Oak house, and that "a lot of people" also stayed there. Stallings offered to accompany the officers as they headed to the White Oak house to arrest Slain and to do a compliance check.

Upon arrival Officer Ramirez observed several vehicles in front of the White Oak house, including two broken down RV's, and heavy brush everywhere. Stallings told the officers that one of the vehicles belonged to Slain, and that its presence there meant he was inside the house. Officer Ramirez testified that because the house was very large and looked abandoned due to its dilapidated condition (part of the roof missing and crumbling walls) the officers were concerned for their safety. Its condition made the house resemble a "crash pad" where anyone might come and go in order to take drugs or conduct narcotic transactions. The officer explained that people under the influence of drugs often failed to control their actions, making police officers subject to possible attack. He was therefore concerned that, like the man arrested at the Jellico house, someone at the White Oak house could be high and thus pose a threat to the officers.

---

**2**    The trial court construed "staying" at the White Oak house meant that the house was "a residence of hers." Indeed, one of the many definitions of "stay" is "[t]o dwell, lodge, reside (permanently or regularly)." (OED Online, stay, v. 1, def. 8.b. (2016) <http://www.oed.com/view/Entry/189409>.)

The front door of the White Oak house was partially open when Officer Ramirez and four other officers approached. When Officer Ramirez saw Slain inside, looking out the window of a makeshift bedroom, he was ordered out of the house. Slain complied and was taken into custody just outside the open front door. Slain was then searched and found to be in possession of methamphetamine. When Slain confirmed that he slept in the room he occupied when the officers arrived, the officers went into the house to conduct the part of the compliance check which required them to search Slain's sleeping area and any accessible common areas. First, for their safety, the officers did a "sweep" of the house for anyone who might be hiding and thus be in a position to attack the officers from behind or to ambush them. During the sweep Officer Ramirez approached the open retractable metal gate which served as the door of the bedroom next to the kitchen. Through the doorway he observed defendant lying on a mattress, a zip gun on the floor next to the mattress, and an ammunition magazine that appeared to be loaded. Hanging on the bedroom wall was what appeared to be a handgun with a makeshift silencer.

Defendant was detained and moved away for safety while the officers investigated the firearms. The gun on the wall turned out to be a toy replica, which was not apparent until inspection by Officer Ramirez. The magazine contained .22-caliber ammunition, and there was a .22-caliber round in the chamber of the zip gun. As they were recovering these items, officers found a clear plastic sandwich bag next to the mattress which contained a substance which resembled methamphetamine. A check of the bathroom next to defendant's bedroom revealed numerous bullets of various calibers and a 12-gauge shotgun shell, as well as different parts of a rifle. While searching the remaining common areas of the house, people found in other bedrooms were asked to wait in a designated place. The only bedrooms searched were those of Slain and defendant.

During cross-examination of Officer Ramirez, defense counsel elicited testimony that Stallings had signed a form consenting to the officers' search of the White Oak house. Officer Ramirez explained that they did not, however, rely on the consent to

justify their search of the house. Instead, the officers entered the house believing they had authority for a probation compliance search of Slain's room and the common areas.

**Defense evidence**

The trial court permitted the defense to call Stallings, but ruled that her testimony would be admitted solely on the issue of Officer Ramirez's credibility Stallings testified that she was homeless at the time of her good friend, defendant's arrest, but slept on and off on the living room couch. Stallings admitted spending more than one night there at a time, and to keeping her belongings there. Stallings was acquainted with five other friends who also stayed in the White Oak house.

Stallings testified that she was asleep at the Jellico house when the police woke her and told her they were looking for her brother. When she claimed not to know where he was, the officers made her go with them to the White Oak house. Stallings denied both telling the officers that her brother lived at the White Oak house and that she went willingly with the officers. She had an outstanding traffic warrant and the officers said they would arrest her if she did not go with them. Stallings waited on the curb while the officers cleared the White Oak house of everyone except defendant, whom they brought out a few minutes later. The police then searched the house. When the officers came back out with a bag and a gun, they induced her to sign a consent to search the house. At first she refused, telling the officers it was not her house and that she did not live there. She ultimately agreed after they promised to make sure defendant received his heart medications regularly.

Slain also testified, claiming that he was arrested just inside the front door of the White Oak house, not outside. He claimed that he was homeless, and was at the White Oak house to visit his sister. He testified that although his sister stayed there occasionally, she was also "essentially" homeless. Slain had fallen asleep on the couch while waiting for Stallings the night before, and sometime during the night moved to the room where he was awakened by the police at 6:00 a.m. He described the second room as the dining room, with a couch. Slain admitted that he kept his television set there, explaining that it did not fit in his truck. He claimed that he did "not really" have any

5

other belongings there.  Slain also admitted using the White Oak address as a mailing address and for his car registration, but denied that he had ever told Stallings that he lived there.  Slain had returned from Louisiana two weeks before his arrest, intending to turn himself in and take care of his outstanding warrant, but had not yet done so.

DISCUSSION

## I.  Suppression motion

### A.  *Standard of review*

Defendant contends that the trial court erred in denying his motion to suppress evidence of the zip gun, ammunition, and methamphetamine.  He argues that the warrantless search of his home violated his rights under the Fourth Amendment because it was presumptively unreasonable and not justified by the facts.

"'The standard of appellate review of a trial court's ruling on a motion to suppress is well established.  We defer to the trial court's factual findings, express or implied, where supported by substantial evidence.  In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment.  [Citations.]'  [Citation.]"  (*People v. Weaver* (2001) 26 Cal.4th 876, 924.)  We consider the evidence in the light most favorable to the trial court's determination; thus we do not resolve conflicts in the testimony, reweigh the evidence or the reasonable inferences drawn from it, or judge the credibility of witnesses.  (*People v. Woods* (1999) 21 Cal.4th 668, 673 (*Woods*).)

### B.  *Protective sweep*

The trial court expressly found that the facts articulated by Officer Ramirez supported a reasonable suspicion that someone inside the house posed a threat to the safety of the officers.  Relying on *Maryland v. Buie* (1990) 494 U.S. 325 (*Buie*), and *People v. Werner* (2012) 207 Cal.App.4th 1195 (*Werner*), the trial court concluded that the search of defendant's house was a properly justified protective sweep incident to Slain's arrest, and that the officers' observation of the contraband in plain view allowed them to search further.

6

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others.  It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." (*Buie*, *supra*, 494 U.S. at p. 327.)  A protective sweep of a house for officer safety requires only reasonable suspicion, not probable cause, to believe there is someone posing a danger to the officers in the area to be swept.  (*Ibid.*; *People v. Celis* (2004) 33 Cal.4th 667, 678.)  An officer's reasonable belief must be based on "'specific and articulable facts'" rather than an "'inchoate and unparticularized suspicion or "hunch."'" (*Buie*, *supra*, at p. 332; *Celis*, *supra*, at p. 677.)

A protective sweep may be justified not only while making an arrest or detention, but also when officers are conducting a valid probation search, "[and] in some instances, an entry of a residence solely to conduct a protective sweep may be justified to ensure the safety of officers effectuating arrests just outside.  [Citations.]" (*Werner*, *supra*, 207 Cal.App.4th at p. 1206, citing *People v. Ledesma* (2003) 106 Cal.App.4th 857, 864 & fn. 3 (*Ledesma*).)  "[C]ases upholding the entry of a house for a protective sweep after police had made an arrest outside the house relied on the rationale that 'in some circumstances, an *arrest* taking place just outside a home may pose an equally serious threat to the arresting officers' as one conducted inside the house.  [Citations.]" (*People v. Celis*, *supra*, 33 Cal.4th at p. 679.)

Defendant does not agree that Officer Ramirez sufficiently articulated facts to support a reasonable suspicion that someone inside the house posed a threat to the safety of the officers.  Under defendant's view of the evidence, the officer's testimony demonstrated only a generalized concern for officer safety, which did not justify a protective sweep.  Defendant recognizes that Officer Ramirez knew someone might be inside the White Oak house, because Stallings had told the officers that people stayed there.  Defendant argues, however, that this was insufficient to raise a reasonable suspicion that any of them presented a threat, without specific information that anyone was high, had weapons, or had a criminal record.

7

Defendant's argument blurs the distinction between reasonable suspicion and probable cause, which is not required for a protective sweep. (*Buie*, *supra*, 494 U.S. at p. 327; *People v. Celis*, *supra*, 33 Cal.4th at p. 678.) "[T]he United States Supreme Court characterized 'reasonable suspicion' as a standard less demanding than probable cause 'not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.'" (*People v. Souza* (1994) 9 Cal.4th 224, 230-231, quoting *Alabama v. White* (1990) 496 U.S. 325, 330.)

Defendant's analysis is flawed for the additional reason that it relies on inferences which conflict with those implicitly drawn by the trial court and supported by substantial evidence. (See *Woods*, *supra*, 21 Cal.4th at p. 673.) Defendant's analysis is focused on just a few of the circumstances cited by Officer Ramirez, omitting the officer's additional reasons for fearing for his safety and the safety of the other officers. To determine whether the officer's suspicion was reasonable, we must take into account "'the totality of the circumstances -- the whole picture -- . . . .' [Citation.]" (*People v. Souza*, *supra*, 9 Cal.4th at p. 230.) Law enforcement officers are allowed to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' [Citations.]" (*United States v. Arvizu* (2002) 534 U.S. 266, 273; *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 145-146.) And we must give "'due weight'" to the officers' factual inferences. (*Arvizu*, *supra*, at pp. 273-274.)

Knowledge that a residence is shared by more than one person, that one or more of them could be drug users or those who associate with drug users, and the presence of more than one vehicle on the premises, are facts that when taken together, would reasonably lead police officers to suspect not only that the house was occupied, but also that the occupants could be dangerous. (*Ledesma*, *supra*, 106 Cal.App.4th at pp. 866-867.) Here, Officer Ramirez articulated all such facts. He testified that he and the other officers first went to the Jellico house where they found Stallings, Hurtado, a narcotics

8

probationer with two outstanding felony arrest warrants, and another man, who was in possession of methamphetamine and appeared to be high. The officers then went to the White Oak house, another residence associated with Stallings, as she "stayed" there, which the court construed as living there. Stallings told Officer Ramirez that "a lot of people" also stayed there, and the officer observed several cars on the property. The dilapidated condition of the house and the yard made it look abandoned, which was consistent with it being a crash pad, meaning a house where anyone might come and go in order to take drugs or conduct narcotic transactions. Indeed, the front door was partially open at 6:00 a.m. Taken together, the circumstances suggested that, like Stallings's acquaintances at the Jellico house, some of the occupants of the White Oak house were also involved in narcotics. Officer Ramirez knew that people under the influence of drugs often failed to control their actions, which could place the officers at risk of a possible attack. The officer thus articulated facts which led him to reasonably suspect that Stallings associated with people who illegally possessed or ingested narcotics and that such people were in the White Oak house and that they were dangerous. Considering all such circumstances, we conclude that Officer Ramirez articulated particularized facts demonstrating an objectively reasonable suspicion that someone inside the house posed a threat to the safety of the officers, thus justifying the protective sweep.

### C. Consent and probation compliance search

Defendant also contends that warrantless entry into the house was not justifiable as a probation compliance check because Slain did not live at the White Oak house, and because the consent given by Stallings was invalid.

Defendant relies on Slain's testimony that he did not live in the White Oak house. We agree with respondent that the trial court's implied finding was to the contrary. As respondent observes, the trial court did not expressly find that Slain did or did not live there; however, the denial of the motion implies that the court resolved Slain's credibility issue against defendant. In addition, Stallings told Officer Ramirez that Slain stayed there, and the trial court expressly construed to "stay" to mean to "live." The implied

9

finding that Slain lived at the White Oak house was further supported by Slain's admission that he used that address to register his cars and to receive his mail, that the police awakened him there at 6:00 a.m., and that he kept his television set in the room that appeared to Officer Ramirez to be a makeshift bedroom.

Consent is an established exception to the Fourth Amendment warrant requirement to search a residence. (*Woods*, *supra*, 21 Cal.4th at p. 674.) Defendant focuses on the consent form signed by Stallings, but the officers did not rely on that consent, nor did they need to do so, as they had Slain's consent. "In California, probationers may validly consent in advance to warrantless searches in exchange for the opportunity to avoid service of a state prison term. [Citations.] For nearly three decades, [the California Supreme Court] has upheld the legality of searches authorized by probation terms that require probationers to submit to searches of their residences at any time of the day or night by any law enforcement officer with or without a warrant. [Citations.]" (*Woods*, *supra*, 21 Cal.4th at pp. 674-675, fn. omitted, quoting *Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 219.)

When there are nonprobationers who share the residence, the probationer's consent to search is limited to those areas over which the probationer is believed to exercise complete or joint authority. (*Woods*, *supra*, 21 Cal.4th at pp. 680-682.) The search in this case was so limited. Officer Ramirez testified that they searched only Slain's sleeping quarters and the common areas of the house, and entered defendant's bedroom only after seeing a zip gun and what appeared to be a silencer in plain view from the doorway. Possession of zip guns and silencers are crimes. (§§ 33600, 33410.) As these items were in plain view from a common area of the house, the officers were justified in seizing the items. (See *Woods*, *supra*, at p. 680.)

Although defendant acknowledges Officer Ramirez's testimony that the officers observed the zip gun and toy silencer in plain view from a position outside his open bedroom, he argues that the items were not really in plain view because Officer Ramirez observed them after defendant stood up in compliance with the officers' orders. Defendant offers no authority for this assertion. With or without a warrant, when officers

10

are conducting a lawful search of a residence during a valid probation compliance check, it is not unreasonable to briefly detain other occupants for safety and to identify the probationer's associates. (*People v. Matelski* (2000) 82 Cal.App.4th 837, 850-852.) We have already determined that the officers were lawfully outside defendant's bedroom door, based upon a probationer's consent and a valid protective sweep. As any detention lasted only so long as it took defendant to stand up, it was extremely brief and minimally intrusive. Under such circumstances, defendant's interest in privacy surely did not outweigh the officers' interest in securing their safety and identifying Slain's cohabitants. (See *id.* at p. 852.)

## II. Probation conditions

Defendant contends that four of the probation conditions imposed by the trial court are unconstitutionally overbroad or vague for failure to include an express knowledge requirement. Defendant challenges the conditions the trial court stated as follows: "[1] You are not to own, use, threaten to use, possess, buy, or sell any deadly or dangerous weapons . . . . [2] You are not to own, use, possess, buy, or sell any controlled substances or associated paraphernalia except with a valid prescription. [3] And stay away from places where users, buyers, and sellers congregate." Defendant also challenges the condition listed in the minutes as follows: "[4] Do not associate with any drug users or sellers unless attending a drug treatment program."[3]

Defendant contends the above-quoted probation conditions should be modified to require defendant not to associate with any *known* drug users or sellers, to stay away from places *known* by him to be where drug users and sellers congregate, except treatment

---

[3]      A trial court's oral summary of conditions may be spelled out in more detail in the minutes, a written order, or the probation officer's explanation, which are binding on defendant so long as he has sufficient notice of the more detailed conditions. (See *People v. Thrash* (1978) 80 Cal.App.3d 898, 901-902.) Here, the probation report and any probation agreement have not been included in the appellate record. However, as defendant refers to the more detailed conditions in the minutes and his only challenge to them is the absence of a knowledge requirement, we assume that he was made aware of and understood the conditions as stated in the minutes.

11

programs, not to *knowingly* possess a dangerous or deadly weapon, and not to *knowingly* possess a controlled substance without a prescription.

"A probation condition 'must be sufficiently precise for the probationer to know what is required of him, and for the court to determine whether the condition has been violated,' if it is to withstand a challenge on the ground of vagueness. [Citation.]" (*In re Sheena K*. (2007) 40 Cal.4th 875, 890 (*Sheena K*.).) A claim that a probation condition is unconstitutionally vague or overbroad may be raised for the first time on appeal, as it presents a pure question of law that can be resolved without reference to the sentencing record. (*Id*. at pp. 887-889.) "[T]he underpinning of a vagueness challenge is the due process concept of 'fair warning.' [Citation.] The rule of fair warning consists of 'the due process concepts of preventing arbitrary law enforcement and providing adequate notice to potential offenders' [citation], protections that are 'embodied in the due process clauses of the federal and California Constitutions. [Citations.]'" (*Id*. at p. 890.)

"California appellate courts have found [some] probation conditions to be unconstitutionally vague or overbroad when they do not require the probationer to have knowledge of the prohibited conduct or circumstances." (*People v. Kim* (2011) 193 Cal.App.4th 836, 843; see also *Sheena K*., *supra*, 40 Cal.4th at p. 892.) The reviewing court should modify a condition if necessary to make it sufficiently explicit that a particular association, place, or item is known to the probationer to be within a prohibited category. (*People v. Pirali* (2013) 217 Cal.App.4th 1341, 1350-1351; see *Sheena K*., *supra*, at p. 892.) Thus, the condition prohibiting the direct or indirect association with users or sellers of narcotics must be modified to prohibit association with known users or sellers of narcotics. (*People v. Garcia* (1993) 19 Cal.App.4th 97, 102; see *Sheena K*., at p. 892.) Some courts have held that a knowledge requirement must be added to a probation condition prohibiting the possession of ammunition or deadly weapons. (See *In re Kevin F*. (2015) 239 Cal.App.4th 351, 365; *People v. Freitas* (2009) 179 Cal.App.4th 747, 752.)

Respondent suggests that we follow a conflicting line of cases that have concluded that a knowledge requirement is "manifestly implied" in probation conditions which

12

reinforce statutes that already contain a scienter element; and that such conditions are thus not unconstitutionally vague although they lack an express knowledge requirement. (*People v. Moore* (2012) 211 Cal.App.4th 1179, 1185 [deadly or dangerous weapon]; see also, *People v. Rodriguez* (2013) 222 Cal.App.4th 578, 593-595 [controlled substances]; *People v. Kim* (2011) 193 Cal.App.4th 836, 847 [firearm].)[4]

The resolution of the conflict is now pending in the California Supreme Court, which has agreed to review a case which followed *Moore*'s reasoning to decline to add an express knowledge requirement to conditions prohibiting possession of firearms and illegal drugs.  (*People v. Hall* (2015) 236 Cal.App.4th 1124, review granted Sept. 9, 2015, S227193.)[5]  Until such time as our Supreme Court holds that an implied knowledge requirement satisfies due process, we will modify the challenged association, stay-away, and conditions to include an express knowledge requirement.[6]

## DISPOSITION

The probation conditions orally pronounced by the trial court and which we numbered 1 through 4 are modified to read as follows:  "You are not to own, use, threaten to use, knowingly possess, buy, or sell any deadly or dangerous weapon; do not buy or sell controlled substances, or knowingly use or possess any controlled substances or associated paraphernalia except with a valid prescription; stay away from places you know to be where users, buyers, and sellers of illegal drugs congregate."  The condition

---

[4]     Respondent also relies on *People v. Patel* (2011) 196 Cal.App.4th 956, where the appellate court modified the probation condition, but as it was weary of the frequency of having to review the knowledge issue, the court gave notice that it would "construe every probation condition proscribing a probationer's presence, possession, association, or similar action to require the action be undertaken knowingly."  (*Id*. at pp. 960-961.)

[5]     No petition for review was filed in a case which followed *Hall*, and it has become final.  (See *People v. Contreras* (2015) 237 Cal.App.4th 868, 887.)

[6]     We will also add "illegal" to the court's references to "drugs" to save them from over breadth; however, we do not modify any unchallenged conditions that may have been incorporated into the judgment by means not apparent from this record.  See footnote 3, *ante*.

13

stated in the court's minutes prohibiting association with drug users or sellers unless attending a drug treatment program is modified to read: "Do not associate with any persons known to you to be users or sellers of illegal drugs unless attending a drug treatment program." All other conditions of probation remain unchanged. As so modified, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.
HOFFSTADT